**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **IN RE: AME CHURCH EMPLOYEE RETIREMENT FUND LITIGATION** | MDL Docket No. 1:22-md-03035-STA-jay<br>ALL CASES<br><br>Honorable S. Thomas Anderson |

**SECOND CONSOLIDATED AMENDED COMPLAINT**

**Jury Trial Demanded**

TABLE OF CONTENTS

SECOND CONSOLIDATED AMENDED COMPLAINT – CLASS ACTION ........................... 1

INTRODUCTION ................................................................................................................. 1

PARTIES ............................................................................................................................... 4

JURISDICTION AND VENUE ........................................................................................... 15

FACTUAL ALLEGATIONS ............................................................................................... 15

   I.    History of the AMEC ................................................................................................. 15

   II.   History of the AMEC Fund ........................................................................................ 18

   III.  The Operative Fund .................................................................................................... 19

   IV.  Defendants' Misappropriation and Mismanagement of the Plan ................................. 22

      A.   Defendants' Failed Oversight of the Plan ........................................................... 22

      B.   The 'Fraudulent Scheme Developed and Operated by Defendants Harris, Eaton, Newport, and Symetra ....................................................................................... 24

      C.   The Role of Eaton .............................................................................................. 38

      D.   Defendant Newport Furthers, Aids, and Conspires in Dr. Harris's Fraudulent Scheme ......... 41

      E.   Defendant Symetra Assists Dr. Harris's Fraudulent Scheme ................................ 54

      F.   Dr. Harris's False Representations to Class Members About the Plan. ................. 58

      G.   AMEC's Alleged Discovery of Dr. Harris's Scheme ........................................... 61

PLAINTIFFS' SPECIFIC ALLEGATIONS ........................................................................ 64

CLASS ACTION ALLEGATIONS .................................................................................... 67

   I.    Class Definition ......................................................................................................... 67

   II.   Rule 23(a) and Rule 23(b)(3) Requirements ............................................................... 67

      A.   Numerosity ........................................................................................................ 67

      B.   Commonality ..................................................................................................... 68

      C.   Typicality .......................................................................................................... 70

      D.   Adequacy of Representation ............................................................................... 71

      E.   Rule 23(b)(1) Requirements ............................................................................... 71

      F.   Rule 23(b)(2) Requirements ............................................................................... 72

      G.   Rule 23(b)(3) Requirements ............................................................................... 72

CLAIMS FOR RELIEF ...................................................................................................... 72

COUNT I  BREACH OF FIDUCIARY DUTY (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against AMEC, AMEC Department of Retirement

i

Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Estate of Dr. Harris, Eaton, Newport, and Symetra) .................................................................. 73

COUNT II Claim for Violation of Tennessee Uniform Trust Code For Breach of Trust and Misappropriation of Trust Funds (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against Estate of Dr. Harris, AMEC, Newport, Symetra, and Eaton) ....... 79

COUNT III NEGLIGENCE (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Newport, and Symetra) .................................................................................................................................. 88

COUNT IV CONVERSION (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against the Estate of Dr. Harris, Sandra Harris, Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Trinity Financial Consultants, LLC, Financial Technologies, LLC, and Day & Night Solar) .............................................................. 91

COUNT V FRAUDULENT CONCEALMENT (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Eaton, Estate of Dr. Harris, Symetra, and Newport) .................................................................. 93

COUNT VI FRAUDULENT MISREPRESENTATION (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against Estate of Dr. Harris and Newport).... 102

COUNT VII BREACH OF CONTRACT  (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against AMEC) .................................................................. 105

COUNT VIII CIVIL CONSPIRACY (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against Estate of Dr. Harris, Sandra Harris, Symetra, Newport, Eaton, Financial Freedom Funds, LLC, Day & Night Solar, Trinity Financial, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities).... 111

COUNT IX AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) (Against Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group, Inc, Financial Technologies, LLC, Day & Night Solar, Trinity Financial Consultants, LLC, the Motorskill Entities, and Sandra Harris) ........................................................................................................................ 116

COUNT X PROFESSIONAL NEGLIGENCE  (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class) .............................................................................................. 121

PRAYER FOR RELIEF ............................................................................................................. 125

## SECOND CONSOLIDATED AMENDED COMPLAINT – CLASS ACTION

Plaintiffs Reverend Pearce Ewing, Reverend Charles R. Jackson, Presiding Elder Cedric V. Alexander, Reverend Derrell Wade, Reverend Reuben J. Boyd, Presiding Elder Phillip Russ, IV, Lynette Glenn, Guardian of Reverend Marcius King, Reverend Matthew Ewing, Reverend A. Offord Carmichael, Jr., and Reverend Diane Conley, (collectively "Plaintiffs") bring this Second Consolidated Amended Class Action Complaint against Defendants African Methodist Episcopal Church Ministerial Retirement Annuity Plan, Newport Group, Inc. ("Newport"), Symetra Life Insurance Company ("Symetra"), Daniel Parrish of Parrish Law, LLC, Administrator Ad Litem of the Estate of Jerome V. Harris, deceased (hereinafter referred to as the "Estate of Dr. Harris"), African Methodist Episcopal Church, Inc. ("AMEC"), African Methodist Episcopal Church, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops,[1] Bishop Samuel L. Green, Sr., Bishop James Davis, Robert Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, Motorskill Ventures, Inc., Motorskill Ventures I, L.P., Motorskill Asia Ventures 1, L.P., Rodney Brown and Company, Trinity Financial Consultants, LLC, Sandra Harris, Day and Night Solar, LLC, Doe Corporations 1-10, and John Does 1-10 (collectively "Defendants"), and allege the following:

## INTRODUCTION

1.      This case is about a conspiracy between a group of businesses and individuals who used their control and influence over a retirement fund to enrich themselves at Plaintiffs' and Class Members' expense.

2.      For nearly two decades, Robert Eaton, Rev. Dr. Jerome V. Harris, Newport,

---

[1] Collectively, the African Methodist Episcopal Church, Inc., African Methodist Episcopal Church, AMEC Department of Retirement Services, AMEC General Board, and AMEC Council of Bishops are referred to as the "AMEC Defendants."

Symetra, and others ignored their fiduciary duties and collectively managed the African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("the Plan") and the fund of retirement assets associated with the Plan ("the Fund") for their own benefits.

3.   Harris and Eaton, with the assistance of Symetra, Newport, and others, engaged in a sustained pattern of self-dealing transactions and made a series of imprudent and/or illegal investments without appropriate oversight from the African Methodist Episcopal Church ("the Church"). Those transactions and investments put hundreds of thousands of dollars, if not millions, in the pockets of the conspirators and ultimately led to the loss of most of the money in the Fund.

4.   The true value of the Fund is roughly $90,000,000 less than what Plaintiffs were promised by Dr. Harris and Newport as recently as June 30, 2021. But the true extent of Plaintiffs' damages is much greater. The misappropriation and mismanagement of the Fund also robbed Plaintiffs of reasonable growth and investment returns for almost two decades, making the actual loss more like $250,000,000. At every step of the way, the conspirators were virtually unchecked by AMEC. For its part, the Church conducted no oversight of how the Fund was being managed.

5.   Newport and Symetra in particular knew that the Fund investments were imprudent and the result of self-dealing. Likewise, numerous accounting entities and service providers, who had fiduciary duties to protect the money and provide correct retirement figures to Class Members, failed entirely, leaving Dr. Harris and his co-conspirators to pursue their scheme. Simply put, Plaintiffs' massive losses simply could not have happened without the legally culpable indifference, at best, of the Defendants.

6.   Plaintiffs bring this class action on behalf of AMEC ministers and other employees who, as a result of Defendants' catastrophic failures to protect their retirement accounts in the Plan, collectively lost tens of millions of dollars in career retirement savings.

7.      Plaintiffs and Class members are ministers, bishops, officers, elders, and other employees (and their respective beneficiaries) of AMEC or AMEC-related educational institutions or programs who have: (i) lost money that was (or should have been) invested in the Fund, or (ii) had diminished investment returns because of Defendants' mismanagement of the Fund.

8.      Defendants oversaw and controlled the investments in the Fund and did not adequately monitor or oversee the Fund. They are each responsible for the Fund's massive losses.

9.      The loss of assets and other mismanagement of the Fund is a direct and proximate result of Defendants' failure to fulfill their duties to Plaintiffs and the putative class.

10.     Subsequent to Plaintiffs' filing of these cases, AMEC filed cross-claims and third party claims blaming Dr. Harris and others and alleging that Dr. Harris and other third-party defendants engaged in fraud against the church and the Plan members.

11.     For purposes of this Second Amended Consolidated Complaint, Plaintiffs do not assert that the Plan is directly governed by ERISA.[2] As a church plan, the Plan is exempted from ERISA unless it affirmatively elected to be governed by ERISA. At this time, Plaintiffs have no evidence that demonstrates or suggests that the necessary election paperwork was filed to make the Plan a bona fide ERISA Plan. Any references to ERISA herein are not intended to assert that the Plan is an ERISA Plan.

12.      However, Plaintiffs do assert and allege that AMEC repeatedly agreed in written Plan documents to govern the Plan in accordance with the requirements of ERISA and breached its contractual obligations. These Plan documents are binding agreements that were provided to

---

[2] Plaintiffs recognize that the Court dismissed the claims they alleged under ERISA in its Order on Motions to Dismiss Consolidated Amended-Class Action Complaint. ECF No. 197. For efficiency only, Plaintiffs have not included those ERISA-based claims in this Second Consolidated Amended Complaint and incorporate those claims by reference to the extent necessary to preserve their appellate rights.

the Plaintiffs and other Class Members. Thus, AMEC should be held to ERISA standards with respect to their management of the Plan and its assets. Plaintiffs are entitled to the remedies enumerated in ERISA, in addition to any remedies under state law, for any failure on the part of AMEC to comply with those standards.

## PARTIES

13.    Plaintiff Reverend Pearce Ewing is a resident of Jacksonville, Florida. Rev. Pearce Ewing served as an AMEC minister for many years and retired in September 2021. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Rev. Pearce Ewing has been a participant in the Plan with vested retirement benefits in the Plan.

14.    Plaintiff Reverend Charles R. Jackson is a resident of Orlando, Florida. Rev. Jackson last served as the Pastor for Mt. Tabor AME Church in Altamonte Springs, Florida. At all times relevant herein, Rev. Jackson has been a participant in the Plan with vested retirement benefits in the Plan.

15.    Plaintiff Presiding Elder Cedric V. Alexander is a resident of Bowie, Maryland. Presiding Elder Alexander served as an AMEC minister and Presiding Elder for approximately 26 years. Presiding Elder Alexander retired in September 2020. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Presiding Elder Alexander has been a participant in the Plan with vested retirement benefits in the Plan.

16.    Plaintiff Reverend Derrell Wade is a resident of Suffolk, Virginia. Rev. Wade currently serves as the Pastor for Macedonia AME Church in Suffolk, Virginia. He has served in AMEC since 1994. At all times relevant herein, Rev. Wade has been a participant in the Plan with vested retirement benefits in the Plan.

17.    Plaintiff Reverend Reuben J. Boyd is a resident of North Chesterfield, Virginia. Rev. Boyd serves as the Pastor of the Third Street Bethel AME Church located in Richmond,

Virginia. He has served in AMEC since 1988. At all times relevant herein, Rev. Boyd has been a participant in the Plan with vested retirement benefits in the Plan.

18.    Plaintiff Presiding Elder Phillip Russ, IV, is a resident of Santa Rosa, Florida. Presiding Elder Russ served as an AMEC minister for over 40 years. Presiding Elder Russ retired in September 2021. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Presiding Elder Russ has been a participant in the Plan with vested retirement benefits in the Plan.

19.    Plaintiff Lynette Glenn is a resident of Jacksonville, Florida and is the court-appointed Guardian of her father, Reverend Marcius King.[3] Rev. King served as an AMEC minister from the age of 16 until he retired in 2017 at the age of 73. Rev. King has been unable to withdraw his funds from the AMEC retirement fund and his efforts to rollover the funds to an IRA were similarly unsuccessful. At all times relevant herein, Rev. King has been a participant in the Plan with vested retirement benefits in the Plan.

20.    Plaintiff Reverend Matthew Ewing is a resident of Cantonment, Florida. Rev. Matthew Ewing served as an AMEC minister for over 43 years. Rev. Matthew Ewing retired in September 2021. Shortly after his retirement, he sought to access monies due him from the Fund. At all times relevant herein, Rev. Matthew Ewing has been a participant in the Plan with vested retirement benefits in the Plan.

21.    Plaintiff Reverend A. Offord Carmichael, Jr., is a resident of Graham, North Carolina. Rev. Carmichael served as an AMEC minister for 50 years before retiring at the most recent annual conference. Rev. Carmichael still serves as an itinerant elder, the highest ministerial

_____

[3] Ms. Glenn was appointed as the Emergency Temporary Guardian of Rev. King on July 25, 2024 in Duval County, Florida. Ms. Glenn is in the process of being appointed the permanent guardian of Rev. King pursuant to Florida law and is scheduled to have her petition heard in late September of 2024.

order in the AMEC. At all times relevant herein, Rev. Carmichael has been a participant in the Plan with vested retirement benefits in the Plan.

22.     Plaintiff Reverend Diane Conley is a resident of Morganton, North Carolina. Rev. Conley began her pastoral service in the church as a supply pastor in 1992. She was ordained as a deacon in 1994. Rev. Conley has been an itinerant elder, the highest ministerial order in the church, since 1996 and she retired in June 2023. At all times relevant herein, Rev. Conley has been a participant in the Plan with vested retirement benefits in the Plan.

23.     Defendant African Methodist Episcopal Church Ministerial Retirement Annuity Plan ("AMEC Plan" or "the Plan") is the operative plan establishing a trust and a trust fund for the benefit of certain AMEC ministers and employees.

24.     Defendant Newport Group, Inc. is a corporation organized under the laws of Florida with its principal place of business in Walnut Creek, California.

25.     Newport Group was a fiduciary by virtue, among other things, of its status and authority as a third-party administrator to the Fund.

26.     Defendant Symetra Life Insurance Company is a corporation organized under the laws of Iowa with its principal place of business in Bellevue, Washington.

27.     Symetra was a fiduciary by virtue, among other things, of its exercise of control over management and disposition of Fund assets.

28.     Rev. Dr. Jerome V. Harris was a citizen and resident of Memphis, Tennessee. He served as the Executive Director of the AMEC Department of Retirement Services from 2000 until June 2021.

29.     Dr. Harris was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. § 35-15-103(13).

30.     Dr. Harris was also a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because Dr. Harris possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, Dr. Harris was a Fund fiduciary.

31.     As stated in the operative Plan Document at Section 9.11, Dr. Harris is identified as a named fiduciary of the Plan.

32.     Dr. Harris passed away on May 8, 2024. At the time Dr. Harris passed away, he had already been named as a defendant in multiple complaints consolidated in this MDL, including the First Amended Consolidated Complaint.

33.     Pursuant to Tenn. Code Ann. § 20-5-102, Plaintiffs' claims against Dr. Harris are not abated by his death.

34.     Therefore, Plaintiffs name Daniel Parrish of Parrish Law, LLC, Administrator Ad Litem of the Estate of Jerome V. Harris, deceased, as a Defendant in this action. Daniel Parrish of Parrish Law, LLC was appointed as Administrator Ad Litem of the Estate of Jerome V. Harris on August 28, 2024, in the Probate Court of Shelby County, Tennessee for the purpose of acting as a party defendant in this Action.

35.     Defendant African Methodist Episcopal Church, Inc. is a Pennsylvania corporation with its principal place of business at 500 Eight Avenue South, Nashville, Tennessee 37203. AMEC's Department of Retirement Services oversaw the Pension Fund and church employees' retirement benefits.

36.     In the abundance of caution, Plaintiffs also include the unincorporated entity "African Methodist Episcopal Church" as a Defendant in this complaint. Plaintiffs do not concede that there is a distinction between these two alleged entities for the purposes of this lawsuit and refer to them collectively as "AMEC" herein.

37.     AMEC is a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

38.     AMEC is also a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because AMEC possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, AMEC is a Fund fiduciary.

39.     As stated in the 2006 Plan Document at Section 9.11, AMEC is identified as a named fiduciary of the Plan and as an Administrator.

40.     Defendant Sandra Harris is a citizen of Memphis, Tennessee and the widow of Dr. Harris. She participated in the scheme to misappropriate Plan assets as detailed below.

41.     Defendant AMEC Department of Retirement Services ("Department") is a separate legal entity from AMEC with the responsibility for administering the Plan. The Department is headquartered in Memphis, Tennessee.

42.     Department is a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

43.     Department is a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because the Department possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, the Department is a Fund fiduciary.

44.     Defendant AMEC General Board ("General Board") is the administrative body of AMEC with elected members from the church.

45.     Defendant AMEC acts through Defendant General Board to carry out its authority to approve the Plan and amendments thereto, appoint, monitor, and remove trustees.

46.     Through its grant and exercise of power to appoint, monitor and remove other fiduciaries, General Board is a fiduciary of the Fund within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

47.     Through its grant and exercise of power to appoint, monitor and remove other fiduciaries, General Board is a fiduciary of the Fund within the meaning of Section 1.20 of the Plan.

48.     Defendant Council of Bishops is the executive body of AMEC, consisting of all the Bishops of the Church.

49.     The Council has and exercises the general oversight authority of the Church.

50.     The Council of Bishops is responsible for enforcing the Church's Doctrine and Discipline, which, among other things, includes direction and promises with respect to the Plan.

51.     The Doctrine and Discipline provides details about the Plan, including clergy and

other employees who must be enrolled by the Church and required Church contributions to the Plan on behalf of Plan participants.

52.    Through its enforcement power over the Plan's terms, the Council of Bishops, and each and every Bishop, is a fiduciary of the Fund within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

53.    Through its enforcement power over the Plan's terms, the Council of Bishops is a fiduciary of the Fund within the meaning of Section 1.20 of the Plan.

54.    Defendant Bishop Samuel L. Green, Sr. served as the Chair of the AMEC Department of Retirement Services from 2016 until July 2021. He is a citizen and resident of Columbia, South Carolina.

55.    Bishop Green was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

56.    Bishop Green was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because Bishop Green possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, Bishop Green was a Fund fiduciary.

57.    Defendant Bishop James Davis served as the Chair of the AMEC Department of Retirement Services from 2012 until July 2016.

58.    Bishop Davis was a fiduciary of the Fund by reason of being a fiduciary within the

meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

59.     Bishop Davis was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because Bishop Davis possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, Bishop Davis was a Fund fiduciary.

60.     Defendant Robert Eaton served as a *de facto* investment advisor and/or formally designated Financial Advisor for Dr. Harris during Dr. Harris's tenure as Executive Director of the AMEC Department of Retirement Services. Upon information and belief, Eaton is a resident of Illinois.

61.     Defendant Eaton was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13).

62.     Eaton was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Because Eaton rendered investment advice for property of the Plan in exchange for compensation, Eaton was a Fund fiduciary.

63.     Defendant Eaton was also a fiduciary because of the position of trust he had assumed with respect to the Fund.

64.     Defendant Financial Freedom Funds, LLC, was an entity formed by Dr. Harris in

2006. It was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Because Financial Freedom Funds, LLC rendered investment advice for property of the Plan in exchange for compensation, Financial Freedom Funds, LLC was a Fund fiduciary.

65.     Defendant Financial Freedom Group, Inc. was an entity formed by Defendants Harris and Eaton in 2007. It was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Because Financial Freedom Group, Inc. rendered investment advice for property of the Plan in exchange for compensation, Financial Freedom Group, Inc. was a Fund fiduciary.

66.     Defendant Financial Technologies, LLC is an entity that is owned, operated, and/or controlled by Defendant Robert Eaton. It was a fiduciary of the Fund within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan, or has any authority or responsibility to do so." Because Financial Technologies, LLC rendered investment advice for property of the Plan in exchange for compensation, Financial Technologies, LLC was a Fund fiduciary.

67.     Defendant Trinity Financial Consultants, LLC is an entity organized under the laws of Tennessee and its sole member is Defendant Jerome V. Harris.

68.     Defendant Day and Night Solar, LLC ("Day and Night Solar") is an entity that is

owned, operated, and/or controlled by Defendant Robert Eaton and is organized under the laws of Illinois. Defendant Day and Night Solar was used by Defendant Eaton to divert plan assets to enrich himself as described below.

69.    Defendants Motorskill Ventures, Inc., Motorskill Ventures I, L.P., and Motorskill Asia Ventures I, L.P. (collectively, the "Motorskill Entities") are private equity funds. Upon information and belief, the Motorskill Entities sometimes did business collectively as "Motorskill Venture Group" and "Motorskill Asia Venture Group". The Motorskill Entities were largely run and operated by Randall Erwin, and his two sons, Jarrod and Ryan.

70.    Motorskill Ventures, Inc. is registered in Delaware as a corporation; its registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808. It was a fiduciary of the Fund and the Plan within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because Motorskill Ventures, Inc. possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, Motorskill Ventures, Inc. is a Fund fiduciary.

71.    Motorskill Ventures I, L.P. is registered in Delaware as a limited partnership; its registered agent is The Company Corporation, 251 Little Falls Drive, Wilmington, DE 19808. It was a fiduciary of the Fund and the Plan within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or

discretionary responsibility in the administration of the Plan." Because Motorskill Ventures I, L.P. possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, Motorskill Ventures I, L.P. is a Fund fiduciary.

72.    Motorskill Asia Ventures I, L.P. is registered in Delaware as a limited partnership; its registered agent is The Company Corporation, 251 Little Falls Drive, Wilmington, DE 19808. It was a fiduciary of the Fund and the Plan within the meaning of Section 1.20 of the Plan. That Section defined fiduciary to include any person who "exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets . . . or has any discretionary authority or discretionary responsibility in the administration of the Plan." Because Motorskill Asia Ventures I, L.P. possessed and exercised such authority and control over the management of the Fund and the disposition of Fund Assets, Motorskill Asia Ventures I, L.P. is a Fund fiduciary.

73.    Defendant Rodney Brown and Company ("Rodney Brown") is a certified public accounting firm.

74.    Upon information and belief, Rodney Brown has a business address at 495 Burnham Avenue, Calumet City, Illinois 60409.

75.    Defendant Rodney Brown was a fiduciary of the Fund by reason of being a fiduciary within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. § 35-15-103(13) and Tenn. Code Ann. § 35-15-807.

76.    Defendants Doe Corporations 1-10 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein. Such parties are named in a "Doe Corporations" capacity pending discovery in this case.

77.    Defendants John Does 1-10 are affiliates or subsidiaries of Defendants here that

may be responsible for the conduct alleged herein or exercised fiduciary authority with respect to the Plan during the class period that are currently unknown to Plaintiffs. Such parties are named in a "John Doe" capacity pending discovery in this case.

## JURISDICTION AND VENUE

78.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000, and there are members of the proposed Class who are citizens of a State different from the State of citizenship of at least one of the Defendants.

79.     This Court may exercise personal jurisdiction over Defendants because Defendants conduct substantial business in this State, including conducting Fund business within this State, and have engaged in the unlawful practices described herein in this District.

80.     Venue is proper in this District under 28 U.S.C. § 1391(b) because: (1) Defendants reside and are subject to the Court's personal jurisdiction in this District and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.    History of the AMEC

81.     The AMEC was the first formally organized African American Christian denomination in the United States.

82.     The first member church of AMEC, Mother Bethel A.M.E. Church, was dedicated in Philadelphia, Pennsylvania in 1794. Richard Allen, a former slave from Delaware, was the church's first leader.

83.     Allen successfully sued in the Pennsylvania courts in 1807 and 1815 for the right of his congregation to exist as an independent institution separate and apart from the existing Methodist Episcopal Church.

84.    In 1816, Allen convened a meeting in Philadelphia with representatives of four other African American congregations from the Mid-Atlantic region. These congregations came together to form AMEC and elected Allen as AMEC's first bishop.

85.    Prior to the Civil War, AMEC was concentrated in the Northeast and Midwest. Major congregations were located in Philadelphia, New York, Boston, Pittsburgh, Baltimore, Cincinnati, Chicago, Detroit, and Washington, D.C.

86.    During the Civil War and Reconstruction, AME clergy moved into the states of the collapsing Confederacy to spread the gospel and educate the newly-freed Black population. By 1880, membership reached 400,000 as AMEC rapidly spread in the South. During this period, AMEC also operated over 2,000 schools and served more than 150,000 students.

87.    Throughout its history, AMEC has relied on the talent and dedication of its ministers and employees. Many of its ministers and employees have made important contributions to American culture and history.

88.    For example, Jarena Lee became the first female AMEC preacher in 1819 and later became the first African-American woman to have her autobiography published in the United States.

89.    AMEC Minister Hiram Revels served as a chaplain in the Union Army during the Vicksburg campaign. In 1870, Revels became the first African-American Senator in United States history.

90.    AMEC Bishop Daniel Payne became the first African-American president of an American college in 1863. Payne served as an AMEC bishop for more than four decades and wrote the first major history of AMEC in 1891.

91.    AMEC Minister Theophilus G. Steward helped inspire AMEC's missionary efforts

among the freed slaves of the former Confederacy with his sermon, "I Seek My Brethren." Steward also served as a U.S. Army chaplain and a founding member of the American Negro Academy, the first organization in the United States to support and promote African-American academic scholarship.

92.     Today, AMEC has more the 2,500,000 members and 7,000 congregations. AMEC is organized into 20 Episcopal Districts, which span 39 countries on 5 continents. The work of the Church is administered by 21 active bishops and nine General Officers who manage departments of the Church.

93.     The General Conference of AMEC is the supreme body of AMEC and is composed of the bishops, an equal number of ministerial and lay delegates, the General Officers, and others. The General Conference meets every four years.

94.     Thirteen of the twenty Episcopal Districts encompass congregations located within the United States and the remaining seven Episcopal District encompass congregations abroad.

95.     Each Episcopal District is made up of annual conferences that cover part or all of a state (or another country). For example, the First Episcopal District is comprised of seven Annual Conferences: Delaware, New England, New Jersey, New York, Philadelphia, Western New York, and Bermuda.

96.     Each Annual Conference is made up of District Conferences that each include a number of local church congregations in a specific geographic area. For example, the New York Annual Conference is comprised of three District Conferences: the Manhattan, Jamaica/Long Island, and Brooklyn-Westchester Districts. Approximately 51 local church congregations are included in the New York Annual Conference and divided between the three District Conferences.

97.     With thousands of local church congregations across the United States, there is a

large portfolio of real property associated with AMEC.

98.     According to The Doctrine and Discipline, the titles to all real, personal, and mixed property held at the General, Annual Conference level or by the local churches shall be held in trust for AMEC (African Methodist Episcopal Church, Inc., i.e., the Church Corporation) and is subject to the provisions of The Doctrine and Discipline.

99.     The absence of an "in trust" clause in a deed or document of conveyance does not relieve a local church of its Connectional character and responsibilities to AMEC.

100.     Evidence of the intent of a local church to conform to the in-trust relationship can be shown by the use of the AMEC name, customs, polity, or literature, as well as the acceptance of pastors or minister appointed by a bishop of an Episcopal District or Annual Conference.

101.     The proceeds from the sale of any local church property should be held in trust for AMEC or disbursed for improving another property owned by AMEC or purchasing another property.

## II.    History of the AMEC Fund

102.     Beginning in the mid-1960s, AMEC provided a retirement plan for its eligible employees.

103.     By the mid-1990s, the Plan was renamed the "African Methodist Episcopal Church Retirement Plan".

104.     The Plan was principally funded in two ways: 1) AMEC employer entities (or AMEC itself) would contribute a portion of eligible employees' compensation to the Fund on each individual employee's behalf; and 2) eligible employees were permitted to contribute additional portions of their compensation to the Fund for their future retirement benefit.

105.     Each employee had an account in the Fund, and the money in each employee's

account was the employee's property.

106.    The monies deposited into the Fund were managed by a trustee, whose responsibility was to ensure that the Fund's assets were properly managed and protected for the benefit of the eligible employees whose earnings had funded the Plan.

107.    Under Plan documents, AMEC retained the ability to "appoint and remove the Trustee from time to time" when "necessary for the proper administration of the Plan to assure that the Plan [was] operated for the exclusive benefit of the [eligible employees] and their Beneficiaries."

108.    After the initial creation of the Plan, AMEC organized a second, separate retirement fund only for ministers and church elders.

109.    This second plan was funded entirely by AMEC.

110.    Additionally, on or about January 1, 2003, AMEC created a third plan, a 401(k) (defined contribution) plan for eligible employees who wished to contribute to their retirement in this form of investment savings.  To contribute, eligible employees reduced their earned compensation and directed their earnings to the 401(k) plan.

## III.    The Operative Fund

111.    At some point in or around 2005, AMEC attempted to consolidate the various governing documents of these plans into one organized retirement investment plan document consisting of three "Levels".

112.    The Plan is now called the Ministerial Annuity Plan of the African Methodist Episcopal Church (the "Plan") and is sponsored by AMEC.  This combined retirement plan is the operative Plan at issue in this case.

113.    Level I consists of the 401(k) defined contribution aspect of the Plan. Level II

consists of AMEC funded retirement benefits. The Plan requires AMEC to fund this Level by contributing 12% of each Plan participant's annual salary. Level III provides annual contributions from the Church's General Treasury to all active Pastors and Presiding Elders.

114.    Upon information and belief, a summary plan description ("SPD") currently found on the Church's website for Church employees is the only SPD issued by AMEC.  The document describes the 401(k) plan, requiring plan participants who wish to participate to elect to reduce compensation to make contributions to the plan.

115.    Upon information and belief, there is no summary plan description describing Level II and Level III components of the Plan.

116.    On its first page, the Plan's SPD declares that "The Plan is subject to federal laws, such as ERISA (the Employee Retirement Income Security Act)."

117.    Pursuant to the terms of the Plaintiffs' employment, Plaintiffs were entitled to have 12% of their salaries contributed to the Fund on their behalf.

118.    The Fund functioned as the vehicle through which the assets of Plan were held, managed, administered and invested, purportedly on behalf of the Plaintiffs and members of the class.

119.    The Fund was supposed to be governed by a Plan document, which Newport was responsible for drafting. Newport did in fact draft a Plan document, but it was originally only signed by Dr. Harris both as the "Trustee" and as the "Employer." Neither Newport nor Symetra ever took any action to confirm that was proper until Newport did in 2019.

120.    In 2019, Newport requested that Dr. Harris return a signed copy of the Plan document, which he ultimately did with his signature as the Trustee and AMEC's CFO's signature on behalf of the "Employer."

121.    The first time Symetra undertook any diligence to determine the scope of authority granted to the Executive Director of the Department was about two weeks after the first lawsuit in this action was filed.

122.    However, the Summary Plan Description, as well as other written communications to the Church's clergy and other employees, including the Church's Doctrine and Discipline (published every four years to provide clergy and Church members updated information on Church beliefs, teachings and practices), all expressly state that the Plan is an ERISA plan, and is to be operated in full compliance with ERISA.

123.    Accordingly, all state, trust and common law claims asserted herein must be read to mandate that the Plan and Fund be operated in compliance with ERISA.

124.    The district court has already concluded, in this case, that the Plan did not elect to be covered by ERISA. For purposes of this Second Consolidated Amended Complaint, Plaintiffs do not assert the Plan is an actual ERISA Plan. Any references to ERISA herein are not intended to assert that the Plan is an ERISA Plan.

125.    However, Plaintiffs do assert and allege that Defendants have made contractual promises to govern the Plan as if it is an ERISA Plan. Therefore, ERISA rights and duties are applicable and certain remedies may be available as a result of Defendants' breaches of contract in addition to any applicable state-law remedies.

126.    As detailed below, Defendants owed fiduciary duties directly to Plaintiffs and the putative Class members.

127.    These fiduciary duties obligated Defendants to conduct due diligence, monitor investments, provide oversight of the trustees and managers, and audit the Fund, all in order to assure that that the Fund was prudently and loyally managed and the assets of the Fund were

prudently and loyally invested.

128.    At all times relevant, the Defendants had the power to monitor, review, dismiss, appoint, and control the operations of various trustee(s) and fiduciaries whose responsibility it was to act in the best interests of the plan participants.

129.    The Doctrine and Discipline provides clergy and Church members updated information on Church beliefs, teachings, and practices.    It also includes a section on the Department of Retirement Services and the Plan.

130.    Starting from at least the 2000 version to the most current 2021 version, the Doctrine and Discipline states that the Plan "**shall be** consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA)" (emphasis added).

131.    All eligible and enrolled participants in the Plan are entitled to distributions pursuant to a Vesting Schedule. Upon official retirement or separation from active service, eligible and officially enrolled participants are eligible to receive the total amount of funds vested in their name, plus accrued interest. Eligible and officially enrolled participants are also permitted to seek disbursements related to hardship.

## IV.    Defendants' Misappropriation and Mismanagement of the Plan

### A.    Defendants' Failed Oversight of the Plan

132.    From 2000 until June 30, 2021, Dr. Harris served as the Executive Director of the AMEC Department of Retirement Services and as Trustee of the Plan, making investment decisions and taking action with respect to the Plan.

133.    As Executive Director, Dr. Harris provided annual reports to the AMEC Commission on Retirement Services of the General Board.

134.    During Dr. Harris' tenure, AMEC appointed a Bishop (including Defendants Davis and Green), to chair the Commission of the Department of Retirement Services, which oversaw

the Department.

135.    Dr. Harris engaged Defendant Eaton ostensibly to assist Dr. Harris in investing the Plan's funds.

136.    After engaging Defendant Eaton, Dr. Harris sent letters to various third parties, including Symetra f/k/a/ Safeco, advising them that Defendant Eaton was the "Broker of record" for the Plan.[4]

137.    On or about December 19, 2001, on Dr. Harris's and Defendant Eaton's recommendation, Defendant AMEC General Board resolved to allow Dr. Harris to move its annuity funds to Symetra Insurance.

138.    On or about December 26, 2001, AMEC opened its investment account with Symetra Insurance by wiring approximately $48,208,803.49 of Plan assets to Symetra.

139.    Unbeknownst to Defendant AMEC General Board or the Plan Participants, Eaton received a commission from Symetra for this transaction, that totaled hundreds of thousands of dollars initially, and substantial recurring monthly tail commissions. Those monthly tail commissions equaled 0.5% of the Plan's assets and are still being paid by Symetra to Eaton on the Plan assets that are still held by Symetra.

140.    AMEC engaged American Express Tax & Business Services ("AMEX TBS") to operate as an independent third-party administrator of the Plan.

141.    AMEX TBS's role as third-party administrator required it to manage the Plan on a day-to-day basis. AMEX TBS's responsibilities included, but were not limited to, tracking balances of Plan participants, and preparing and sending statements to Plan participants.

142.    In mid-2005, H&R Block acquired AMEX TBS, and rebranded it under the name

---

[4] Safeco Insurance rebranded as Defendant Symetra Life Insurance Company in approximately 2005. For the sake of convenience, this Complaint refers to Safeco and Symetra as Symetra.

RSM McGladrey.

143.    RSM McGladrey was then sold by H&R Block to an entity called Pension Specialist, Inc., which was later rebranded to Verisite, and then merged with Defendant Newport in 2014.

144.    Through all these corporate changes to the Plan's operative third-party administrator, all relevant liabilities related to the third-party administration of the Plan ultimately ended up with Defendant Newport.

145.    Both AMEC (by and through its representatives such as Defendant Green) and the third-party administrators failed to engage in proper oversight over Dr. Harris and his investment decisions.

146.    Further, as alleged below, AMEC never performed a proper audit and the Plan's third-party administrators did not seek to verify investments or the account balances on statements it sent to Class members.

**B.  The Fraudulent Scheme Developed and Operated by Defendants Harris, Eaton, Newport, and Symetra**

147.    In 2001, Defendants Dr. Harris, Eaton, Newport, and Symetra began their long-running conspiracy to, *inter alia*, misappropriate funds, defraud Plaintiffs, and manage the Fund for their own benefits and to the detriment of the Plaintiffs and the Plan.

148.    This scheme had a variety of overlapping components, including:

a.    Steering Fund assets into low-performing Symetra annuities that enabled Eaton to receive large commissions and Symetra to obtain a source of cheap capital with minimal obligations to generate returns for the Fund;

b.    Symetra's payment of inflated "administrative fees" to Dr. Harris as an inducement for Dr. Harris to keep Fund assets in Symetra annuities;

    c. Routing Fund assets through a series of corporate entities controlled by Dr. Harris and Eaton that skimmed fees for fraudulent and/or illusory services;

    d. Steering Fund assets into the Motorskill Entities in exchange for "commissions" paid to Eaton and Dr. Harris;

    e. Permitting Dr. Harris and Eaton to engage in obvious prohibited investment and loan transactions;

    f. Covertly assisting Dr. Harris's reelection efforts to secure his position as Trustee and prolong the corrupt bargain between Dr. Harris, Eaton, Newport, and Symetra; and

    g. The use of Newport and Symetra to "launder" fraudulent and unsupported claims about the value of the Fund and the Fund's investment strategy as coming from financial professionals rather than Dr. Harris and Eaton.

149. Dr. Harris created AMEC Financial Services, LLC in 2002 to serve as a primary vehicle for his investment schemes and business ventures with third parties.

150. The activities of AMEC Financial Services, LLC included, *inter alia*, entering into a marketing alliance with Financial Technologies, LLC to provide unknown and possibly illusory services in exchange for compensation to Financial Technologies and Eaton.

151. AMEC Financial Services, LLC was converted to a C corporation in 2010 and thereafter was a subsidiary for-profit entity of AMEC. At least on paper, the Plan owned 100% of AMEC Financial Services, LLC's voting stock. In reality, Dr. Harris controlled AMEC Financial Services, LLC as if it was his own.

152. Financial Technologies, LLC is an entity that is owned, operated, and/or controlled by Eaton.

153.    Dr. Harris engaged Eaton through Financial Technologies, LLC to serve as AMEC's "exclusive broker of record" for the Plan.

154.    Upon information and belief, Financial Technologies, LLC and Eaton received compensation through this broker arrangement.

155.    In 2004, the AMEC Department of Retirement Services, in conjunction with AMEC Financial Services, LLC, loaned Financial Technologies, LLC more than $500,000. Eaton signed on Financial Technologies, LLC's behalf and used the commission checks he and Financial Technologies LLC received from Symetra related to the Fund as collateral to secure the loan.

156.    The loan was originally due to be repaid in three years, but roughly a year after the loan was made, Financial Technologies, LLC obtained a favorable settlement agreement with AMEC and AMEC Financial Services LLC.

157.    Under the terms of the settlement agreement, AMEC and AMEC Financial Services LLC discharged the debt owed by Financial Technologies in exchange for certain tangible and non-tangible assets that are believed to be worth far less than $500,000.

158.    Subsequently, Defendant Financial Freedom Funds, LLC ("Freedom Funds") was formed by Dr. Harris in 2006, but for some reason an operating agreement wasn't executed until 2008.

159.    The documents establishing Freedom Funds listed "Dr. Jerome V. Harris, AMEC Financial Services" as the Manager of Freedom Funds.

160.    Eaton signed the Freedom Funds operating agreement as a "consultant" to Freedom Funds.

161.    For roughly fifteen years, Dr. Harris used Freedom Funds as a vehicle to divert millions of dollars from the Department and the Plan.

162.    Freedom Funds made numerous high-risk, speculative, imprudent, and/or fraudulent investments.

163.    For example, Dr. Harris opened and maintained an investment brokerage account for Freedom Funds at Deutsche Bank.

164.    Ryan Erwin, a Motorskill employee, was authorized to make transactions with Freedom Fund's Deutsche Bank account.

165.    On numerous occasions, Ryan Erwin engaged in day trading stocks with Freedom Funds assets that were diverted from the Plan.

166.    Defendant Financial Freedom Group, Inc. ("Freedom Group") was formed by Dr. Harris and Eaton in 2007.

167.    Dr. Harris and Eaton each owned a 50% share in Freedom Group.

168.    Eaton served as the president of Freedom Group.

169.    For roughly fourteen years, Dr. Harris, in conjunction with Eaton, used Freedom Group as a vehicle to divert money from the Department and the Plan.

170.    Dr. Harris and Eaton were listed as signatories for agreements involving Freedom Group.

171.    Freedom Group's business transactions included, *inter alia*, a loan of more than $500,000 from AMEC Financial Services.

172.    Trinity Financial Consultants, LLC ("Trinity") was formed by Dr. Harris in 2008.

173.    Dr. Harris was listed as the managing member of Trinity.

174.    Dr. Harris, along with his son, Christopher Harris, and the Department's executive administrative assistant, Gloria Peterson, were on the payroll for Trinity from 2009 until October of 2021. They were each paid salaries from Trinity that essentially doubled what they were

receiving from the Department.

175.    For roughly thirteen years, Dr. Harris used Trinity as a vehicle to divert money from the Department and the Plan.

176.    Trinity's business transactions included, *inter alia*, a Management and Administrative Services Agreement between Trinity and Freedom Funds and a substantially similar Administrative Services Agreement between Freedom Group and Trinity.

177.    In the agreement between Trinity and Freedom Funds, dated July 1, 2009, Trinity stated that it "is experienced and skilled in the performance and general management, business advisory, program performance, administrative, fiscal, legal and accounting services" and that "in order to further its investment strategies [Financial Freedom Funds, LLC] is in need of such services and desires to engage Trinity Financial Consultants to perform such services." Freedom Funds agreed to pay Trinity $300,000 annually for these services.

178.    In a separate agreement between Freedom Group and Trinity, also dated July 1, 2009, Freedom Group stated it "is experienced and skilled in the performance and general management support, business advisory, market reviews, program performance reviews, maintain regular contact and collect updated holding analysis and reviews, provide as needed administrative support." and that "in order to further its investment strategies, [Trinity] is in need of such services and desires to engage Financial Freedom Group, Inc. to perform such services." Trinity agreed to pay Freedom Group $110,000 annually in addition to annual expenses not to exceed $125,000.

179.    Meanwhile, Freedom Funds also entered into a Management and Administrative Services Agreement with AMEC Financial Services LLC. This Agreement, dated January 11, 2008, stated that "AMEC Financial Services, LLC is experienced and skilled in the performance of general management, business advisory, program performance, administrative, fiscal, legal and

accounting services." and that "in order to further its investment strategies, [Financial Freedom Funds, LLC] is in need of such services and desires to engage AMEC Financial Services, LLC to perform such services." Freedom Funds agreed to pay AMEC Financial Services 65 basis points for its Management and Administrative Services plus direct and indirect expenses.

180.     Therefore, while Freedom Funds was receiving assets from the Plan under the guise of "investments," it was using those funds to pay both AMEC Financial Services LLC and Trinity substantial amounts for identical management and administrative services and at the same time Trinity was paying Freedom Group for similar services that it was getting paid to perform for Freedom Funds.

181.     All of the "services" provided by AMEC Financial Services, LLC, Financial Freedom Group, and Trinity Financial Consultants were fraudulent and/or illusory.

182.     Dr. Harris's wife, Defendant Sandra Harris, worked at the Department for several years in the 2000s and the 2010s, including in at least 2012, as the Executive Assistant to the Director, focusing on special projects.

183.     Sandra Harris was also a signatory for a bank account in the name of Defendant Trinity Financial Consultants, LLC. Plan assets were directed into this bank account.

184.     Additionally, any Plan assets embezzled by Dr. Harris almost certainly went into at least one of four joint bank accounts held by Dr. Harris and Sandra Harris.

185.     Dr. Harris used Freedom Funds and other financial entities within his control to make high-risk investments in various Motorskill Entities, venture capital companies run by Randall Erwin and his two sons. The Motorskill entities paid kickbacks to Dr. Harris and Eaton for each investment they made with Plan assets.

186.     Randall Erwin initially served as the representative of Motorskill Entities in its

dealings with Dr. Harris and entered into various agreements with Dr. Harris.

187.    Randall Erwin's son, Jarrod Erwin, later took over Randall Erwin's role as the representative of Motorskill Entities in its dealings and agreements with Dr. Harris.

188.    From roughly 2005 to 2016, Dr. Harris invested more than $36 million of Plan assets in Motorskill Entities.

189.    Dr. Harris made these investments by submitting requests for Symetra to electronically wire funds Plan funds either directly to the Motorskill Entities or to entities owned and controlled by Dr. Harris. The first time that Dr. Harris sought to make investments in Motorskill, as further described below, he requested that Symetra wire $10 million of plan assets to an LLC that Symetra knew was owned/controlled by Dr. Harris and Eaton. After that transaction, Dr. Harris sometimes requested that Symetra transfer Plan funds directly to the Motorskill Entities. In other instances, Dr. Harris requested that Symetra route the funds to Freedom Funds and/or other entities that were controlled by Dr. Harris and/or Eaton. After using agreements for fictitious management services to skim off a portion of those funds, Dr. Harris would re-route those funds from Freedom Funds into the Motorskill Entities.

190.    The Motorskill Entities stopped providing financial statements to Newport in 2019.

191.    Despite not receiving the Motorskill Entities' financial statements, Newport continued to provide Plan participants with quarterly statements reflecting account balances that included investments in the Motorskill Entities, and stated amounts in those investments without any basis for doing so.

192.    On June 11, 2021, Dr. Harris received written notification that the investments in the Motorskill Entities were virtually worthless.

193.    Dr. Harris and Eaton also took a share of the converted funds as "commissions".

These commissions were essentially kickbacks for steering the Plan's assets to the Motorskill entities.

194.    The funds in which the Plan invested were terminated by Motorskill.

195.    The only known asset of value remaining in the Motorskill Entities is an 11% membership interest in Day and Night Solar, LLC.

196.    This asset's value is unknown but almost certainly not anywhere close to the tens of millions of dollars that were originally invested in the Motorskill Entities.

197.    AMEC's cross-claims allege that Dr. Harris, without authority, used Plan funds to issue loans to various entities, some of which have not been repaid.

198.    Dr. Harris used funds from the Department and/or Plan to loan over a half a million dollars to Defendant Day and Night Solar, LLC.

199.    Eaton also solicited investments in Day and Night Solar from the Plan as well as from Motorskill, which was done using Plan assets.

200.    These investments in Day and Night Solar were solicited by Eaton to enrich himself to the detriment of the Plan and in breach of his fiduciary duties owed to the Plan.

201.    Defendant Day and Night Solar, LLC was created by Eaton in 2009.

202.    Eaton is the president of Day and Night Solar, LLC.

203.    At its formation, Dr. Harris owned as much as a 41% stake in Day and Night Solar.

204.    In August 2010, Dr. Harris resigned his membership interest in Day and Night Solar upon advice of counsel due to the conflict of interest that arose from making these loans.

205.    Upon information and belief, the "counsel" that advised him to do this was working on behalf of AMEC at the time.

206.    Therefore, AMEC was on notice that Dr. Harris was using Plan assets improperly.

207.    Even a cursory review of Plan assets by AMEC's general counsel, the General Board or anyone else with an interest in protection the Plan would have revealed that the Plan was being unlawfully looted by Dr. Harris, Eaton, and other defendants to whom they gave access to Plan funds.

208.    Dr. Harris also invested $2.5 million of the Plan's assets in undeveloped land in Key Marco, Florida.

209.    Key Marco Holdings, LLC was listed on the note, mortgage, and loan documents associated with that undeveloped land.

210.    Key Marco Holdings, LLC was purportedly established by Dr. Harris and Eaton to isolate this investment from the other Plan investments to avoid any potential liability issues.

211.    The sole member of Key Marco Holdings, LLC, is Defendant Financial Freedom Funds, LLC.

212.    A recent valuation of these properties indicates that they are worth less than half of the $2.5 million original loan amount.

213.    Key Marco Holdings, LLC still holds title to five parcels of undeveloped land (Lots 11, 12, 13, 14 and 16, Block 5, Horr's Island, A/K/A Key Marco, recorded in Plat Book 21, Pages 5-19, of the Public Records of Collier County, Florida).

214.    Eaton recommended investments in one or more Motorskill investment ventures, Day & Night Solar, LLC, and Key Marco Holdings, LLC.

215.    Eaton recommended these investments to Dr. Harris.

216.    Eaton maintained his own investment stake in Day & Night Solar, LLC, and Key Marco Holdings, LLC (through Financial Freedom Funds).

217.    Eaton was compensated by Dr. Harris for his investment recommendations with

funds that were withdrawn from the Fund and/or returns from investments made by the Plan.

218.    The actions of Defendants failed to reasonably or reliably protect the interest of the Plaintiffs in their investments.

219.    Prior to Dr. Harris's tenure as Executive Director, the Department retained the services of Rodney Brown and Company to audit the Department's financial statements annually.

220.    Rodney Brown audited the Department's revenues and expenses and confirmed the balance of the Plan's assets by relying on Newport's CPA, David Fiszer.

221.    Rodney Brown subsequently certified that the total account balances of annuities held and invested on behalf of the Plan were in excess of $128,000,000 in 2020 and 2021.

222.    Those representations by Rodney Brown were based on the representations he received from David Fiszer.

223.    David Fiszer represented annually to Rodney Brown that Newport was "not aware of any restrictions or covenants associated with the plan investments" as of the date of each respective letter he sent to Rodney Brown.

224.    Rodney Brown's audit report stated that it was required to obtain reasonable assurances that the Department's financial statements were free from material misstatement.

225.    Lastly, in the more than 20 years that Dr. Harris was executive director of the Department, and despite the involvement of these Defendants, no portion of Plan assets were invested in standard investment vehicles for pension plans such as publicly-traded stocks, mutual funds, government securities, and treasury bonds.

226.    Instead, the majority of the Plan's investments were in extremely low-performing annuities and high-risk, possibly fraudulent, venture capital funds.

227.    The rest of the Plan's investments—undeveloped real estate, a private solar

company, and unsecured loans to AMEC Financial Services, Inc., Financial Freedom Group, Financial Freedom Funds, and Day & Night Solar—were also imprudent.

228.    In December 2001, when the entirety of the Plan's contemporaneous assets were deposited with Symetra, Dr. Harris and the AMEC Defendants agreed to invest more than $48 million in an annuity with only a 1.5% minimum interest rate.

229.    Although it often earned slightly more than that 1.5% minimum rate, for long periods of time (such as 2017 through 2021), the Plan's funds with Symetra only earned the minimum rate of 1.5%.

230.    By contrast, on December 31, 2001, the 10-year U.S. Treasury Yield opened at 5.11% and the 30-year U.S. Treasury Yield opened at 5.54%.

231.    According to the United States Department of Labor, the geometric mean of investment returns for ERISA-governed pension plans with 100 or more participants for the period between 2002 and 2021 was 7.3%. And over that same time period, the S&P 500's annualized returns were 9.4%.

232.    If the Plan's 2001 assets had been prudently and reasonably invested based on industry standards for the investment of a pension fund, by 2021 those assets would have been worth significantly more than even the fraudulent figure of $128 million that Dr. Harris reported in June of 2021. In fact, had Dr. Harris just invested the initial $48,208,803.49 in a diversified portfolio that performed at the above-described average rate of return of 7.3%, the Plan's assets would have been worth $197,297,141.01 in June 2021. If Dr. Harris had instead placed the initial funds into an S&P 500 index fund (which had an annualized return of 9.038% from December 2001 through June 2021), the Plan's assets would have been worth $272,072,026.94.

233.    The above estimates of growth do not include any net contributions that were made

to the Plan between 2001 and 2021. Because those contributions over a two-decade period could have also grown at an average rate of 7.3% or more, the true gap between the potential value of the Fund and the lower figure reported by Dr. Harris is even greater.

234.    Dr. Harris and Eaton rejected opportunities to safely invest Plan assets for higher returns than what the Plan received from Symetra annuities.

235.    For instance, in October 2001, MetLife Resources offered AMEC the opportunity to invest Plan assets in a Fixed Interest General Account.

236.    The initial rate of return on this account would have been 4.24% - - almost triple the rate of return offered by the Symetra annuities.

237.    The contractual minimum rate of return for the Plan's contract with MetLife would have been 3% - - double the rate of return offered by the Symetra annuities.

238.    MetLife also offered AMEC the opportunity to invest Plan assets in a variety of mutual funds, some of which had conservative approaches to investment risk.

239.    Upon information and belief, Dr. Harris and Eaton did not invest Plan assets in MetLife or other alternative investment vendors because they believed Symetra was more willing to allow Dr. Harris and Eaton to enrich themselves with commissions, kickbacks, and prohibited transactions.

240.    On or about 2009, a former Symetra employee proposed that the Plan move its assets from Symetra to a fixed income account held by a different financial services provider, OneAmerica.

241.    OneAmerica offered better fixed-income returns to the Plan than what the Plan was receiving from Symetra.

242.    Dr. Harris and Eaton declined to move the Plan's assets from Symetra to

OneAmerica.

243.    Upon information and belief, Dr. Harris and Eaton did not move Plan assets from Symetra to OneAmerica because they believed Symetra was more willing to allow Dr. Harris and Eaton to enrich themselves with commissions, kickbacks, and prohibited transactions.

244.    As part of its effort to keep Dr. Harris's business, Symetra paid Dr. Harris "administrative fees" that were excessive and violated the published AMEC Business Practices for Retirement Annuity Contribution Processing.

245.    Those business practices stated that contributions to the Plan were "subject to [a] 2% [fee] of each contribution for department operations."

246.    These written instructions from AMEC did not give or delegate any authority to Dr. Harris to charge a fee greater than 2% of *contributions*.

247.    These business practices were published and received by Newport.

248.    These business practices were also received by Symetra.

249.    Instead of assessing a 2% fee on contributions, Symetra paid Dr. Harris a quarterly fee of 0.25% on the entire Symetra account balance for AMEC. This was essentially a 1% annual fee on all AMEC assets at Symetra.

250.    This 1% fee on assets was at all relevant times significantly larger than a 2% fee on contributions.

251.    The 1% fee on assets violated the AMEC Book of Discipline and published AMEC Business Practices for Retirement Annuity Contribution Processing.

252.    This 1% fee was illogical and onerous as applied to a Symetra account that was only earning 1.5% a year. The effect of the fee was to ensure that AMEC's money with Symetra was earning significantly less than inflation and therefore losing real (inflation-adjusted) value.

253.    There was no plausible, legitimate business reason for Symetra to pay Dr. Harris a 1% fee on all AMEC assets held by Symetra.

254.    Instead, Symetra paid this 1% fee as part of an agreement between Dr. Harris, Symetra, and Newport in 2005.

255.    On May 18, 2015, Dr. Harris requested that Symetra increase the quarterly administrative fee from 0.25% to 0.55% "until further notice." This was essentially a request for Dr. Harris to receive a 2.2% annual fee on all AMEC assets at Symetra.

256.    Symetra quickly agreed to this request. Symetra's next payment of administrative fees to Dr. Harris occurred on June 24, 2015.

257.    That Symetra quarterly payment was for $233,332.50 - - an amount more than twice as much as Symetra's last quarterly payment.

258.    This money was taken directly from the Plan's assets and sent to Dr. Harris, who converted it to his own purposes.

259.    These "administrative fees" were not wired by Symetra to the Department's bank account. Instead, Symetra would send Dr. Harris a check, made out to "Dr. Jerome V. Harris, Trustee" which left him free to do as he pleased with the funds. Typically, Dr. Harris would cash the check and deposit a round, even amount of the check into a Department bank account to cover the department's expenses, and he would then apparently pocketing the delta between the even amount he deposited and the rest of the check.

260.    For example, in September 2018, Dr. Harris received a check for these "administrative fees" from Symetra, signed by its CEO Margaret Meister. The check was made out to "Harris, Dr. Jerome V, Trustee AMEC Department of Retirement Services" in the amount of $221,056.78. Dr. Harris cashed that check on or about October 4, and deposited the funds as

follows:

    a.  $75,000.00 into the Department's general bank account;

    b.  $75,000.00 into a bank account for Trinity Financial;

    c.  $10,000.00 was used to pay a credit card bill for AMEC Financial Services;

    d.  $50,000.78 was deposited into the Department's operating account that was used for its payroll;

    e.  $7,056.00 was used to pay Dr. Harris's personal credit card; and

    f.  Dr. Harris kept $4,000 in cash.

261.    By paying Dr. Harris kickbacks out of the Plan's own assets, Symetra was able to keep Dr. Harris's business without sustaining a significant hit to its own bottom line.

262.    The difference between the 2% of contributions that Symetra was permitted to pay Dr. Harris and the 2.2% of Plan assets held at Symetra was substantial. Just between 2016 and 2019, Symetra paid Dr. Harris more than $3,530,000 in "administrative fees." Over that same time period, the maximum amount of legitimate fees would have been less than $650,000.

263.    At no point prior to Dr. Harris's retirement did Symetra exhibit any concern about paying out 2.2% of assets in "administrative fees" for an account that was only earning 1.5%.

264.    As a consequence of Symetra's agreement with Dr. Harris to pay such excessive fees, the Plan's assets at Symetra continuously lost value.

**C.  The Role of Eaton**

265.    Eaton was the "exclusive broker of record" for the Plan and was represented as such to third parties, including Symetra and Newport.

266.    As the "exclusive broker" for the Plan, Eaton had fiduciary duties to the Plan.

267.    At the same time, Eaton was a "producer" for Symetra, responsible for generating

sales of Symetra products. Eaton was paid commissions by Symetra for business that he brought to Symetra.

268.    Eaton and his firm, Financial Technologies, LLC, was hired in August 2001 by Dr. Harris and AME Chairman of Employee Security John Hurst Adams to select a new investment vendor for the Plan.

269.    Subsequently, Dr. Harris, Eaton, and Adams selected Symetra's corporate predecessor, Safeco Insurance, from thirty-three different annuity investments and insurance firms.

270.    As part of the selection process, Dr. Harris, Eaton, and Adams personally interviewed Safeco Insurance in Nashville, Tennessee.

271.    Adams and Dr. Harris subsequently claimed that Safeco Insurance was selected "due to its superior abilities and willing commitment to the non-negotiable criteria established."

272.    Unbeknownst to the Plan, Symetra paid Eaton a commission for brokering the initial deal between the Department and Symetra and then received monthly tail commissions from Symetra.

273.    The commissions Eaton was paid from Symetra were the largest Symetra had ever paid to a broker.

274.    Symetra was fully aware of, and in fact celebrated, Eaton's status as a recipient of large commissions. Symetra featured Eaton on the cover of a marketing magazine to highlight how much other brokers could earn by steering large investments to it.

275.    Because Symetra was interviewed in Nashville by Eaton as part of the initial selection process, Symetra knew that it was paying commissions to an individual who had been retained by the AME Church to conduct an objective evaluation of business proposals from competing companies.

276.    Eaton also brokered the initial agreement between the Department and Newport.

277.    Eaton had regular direct communication with employees from both Newport and Symetra throughout the twenty years that Plan assets were lost or embezzled.

278.    Additionally, starting from at least 2005, if not earlier, Eaton was also a contracted consultant for the Motorskill Entities and received a regular consulting fee as well as commissions on sales revenue to any Motorskill company.

279.    Newport and Symetra also knew of Eaton's employment with Motorskill, as he regularly corresponded with Newport and Symetra employees from an @motorskill.com email address.

280.    Likewise, for several years in approximately the mid-to-late 2000s, Eaton was employed by VBC Broadcasting Corporation as a Vice President of Global Sales. VBC Broadcasting Corporation was a Motorskill-related company organized in 2006 with Jarrod Erwin serving as the President.

281.    For several years in approximately the mid-to-late 2000s, Eaton was employed by VoiceTech Communications Corp. USA as a Vice President. VoiceTech Communications Corp. USA was a Motorskill-related company organized in 2002 with Jarrod Erwin serving as the President and Director.

282.    For several years in approximately the late 2000s and early 2010s, Eaton was employed by Lifeline Energy International, Inc. as a Vice President of Global Sales. Lifeline Energy International, Inc. was a Motorskill-related company organized in 2008 with Jarrod Erwin serving as the President and Director and Ryan Erwin serving as the Vice President and Director.

283.    For several years in approximately the late 2000s and early 2010s, Eaton was employed by Lifeline Energy USA, LLC as a Vice President of Global Sales. Lifeline Energy

USA, LLC was a Motorskill-related company organized in 2009 with Jarrod Erwin serving as the President and Director and Ryan Erwin serving as a Director.

284.    Eaton's relationship with the Motorskill entities was very lucrative to him. In 2009, the year that $6 million of Plan assets were invested into Defendant Motorskill Ventures I, L.P., Eaton received $200,000 in consulting or placement fees from Defendant Motorskill Ventures I, LP.

285.    Additionally, between 2009 and 2014, Financial Freedom Group, Inc. (the investment entity jointly and equally owned by Dr. Harris and Eaton) received $840,000 in consulting and placement fees from Motorskill Ventures I, LP.

286.    In that same time period, Trinity Financial Consultants, LLC received $270,000 in consulting and placement fees from Motorskill Ventures I, L.P.

287.    On top of those lucrative kickbacks that Eaton was paid for steering Plan investments to Motorskill, he also steered Plan assets (directly from the Plan and indirectly through the Motorskill investments) into a solar company that he founded in 2009. That solar company is Day & Night Solar.

288.    Among other things, Eaton secured favorable loans for Day & Night Solar from Plan assets as well as directed investments in Day & Night Solar from the Plan and from Motorskill (using Plan assets) that only enriched himself.

### D. Defendant Newport Furthers, Aids, and Conspires in Dr. Harris's Fraudulent Scheme

289.    As early as 2005, Newport agreed to advise Dr. Harris on how he could extract money from the Plan.

290.    In February 2005, Dr. Harris sent Mark Yahoudy (a managing director and CPA at Newport and one of the primary Newport employees on the AMEC account) a letter asking his

"input and interpretation" of certain passages in the AMEC Book of Discipline. Robert Follette (a project manager for retirement services at Symetra) and Eaton were copied on this letter.

291.    Specifically, Dr. Harris asked Yahoudy if he agreed that the AMEC Book of Discipline entitled him to take 2% of the total fund every year in administrative fees.

292.    In fact, the AMEC Book of Discipline never authorized such a withdrawal.

293.    Due to some poor wording in the 2000 and 2004 Book of Discipline, the Book of Discipline contained some language that might (in isolation) authorize a fee based on a percentage of the "fund." However, other language in the Book of Discipline clearly indicated that when the Book used the word "fund" it actually meant "contribution."

294.    Upon information and belief, prior to 2005 the Department of Retirement Services had taken out 1% of contributions to the fund as a fee up to a capped maximum of $20,000.

295.    Upon information and belief, Dr. Harris did not seek to confirm his "interpretation" of the Book of Discipline with AMEC's legal counsel because he did not want others at AMEC to learn that he planned to start withdrawing $580,000 annually from the fund.

296.    By approaching Yahoudy instead, Dr. Harris was able to assess Newport's willingness to collaborate with him and obtain possible cover if his interpretation was ever questioned.

297.    Yahoudy subsequently spoke with Dr. Harris and blessed his interpretation of the Book of Discipline.

298.    Yahoudy's advice was unreasonable and not rendered in good faith.

299.    His advice was provided with the intent of keeping Dr. Harris happy and maintaining his business.

300.    Such advice by Yahoudy was utterly inconsistent with any notion of Newport being

a simple compiler of investment figures and processor of ministerial tasks.

301.    Starting in March 2005, Dr. Harris started to withdraw between $140,000 and $180,000 per quarter from the Fund balance at Symetra, much of which he pocketed for himself after covering some of the Department's expenses.

302.    This withdrawal was part of a deliberate agreement between Dr. Harris, Symetra, and Newport to maximize Dr. Harris's ability to make withdrawals from the Fund.

303.    The amount of withdrawals gradually declined over time as Dr. Harris drained more money from the Fund into the Motorskill Entities, other imprudent investments, and corporate entities in which he and/or Eaton held an interest.

304.    To reverse this decline, Dr. Harris submitted his 2015 request for Symetra to increase the amount of his withdrawals from 1% of the Fund per year to 2.2% per year. This amount exceeded the maximum percentage of 2% that Yahoudy had previously erroneously advised Dr. Harris was acceptable to withdraw from the Fund.

305.    In 2012, as part of a general update and modernization of the Book of Discipline, AMEC cleaned up its previous language and made it crystal clear that administrative fees were limited to 2% of *contributions* (not of the total amount in the Fund).

306.    Newport never rescinded its advice that Dr. Harris was entitled to withdraw 2% of the total Fund balance every year.

307.    In addition, Newport knew that the valuations of the Motorskill investments were essentially fiction.

308.    The Motorskill Entities issued financial statements (subscriber ledgers) twice a year, at the end of each June and December.

309.    The financial statements listed each investment made with Plan assets into a

Motorskill fund, as well as the dividend shares that would be earned on each investment if a liquidity event occurred.

310.    The ledgers were issued for the investments made directly from AMEC's accounts with Symetra and for the investments that were channeled from Symetra through Financial Freedom Funds on their way into the Motorskill Entities.

311.    Newport received copies of these financial statements from Dr. Harris.

312.    By and large, almost every investment of Plan assets into the Motorskill Entities was the purchase of subscription units of a Motorskill private equity fund at $5.00 per unit.

313.    Upon information and belief, each new Motorskill investment was valued at the $5.00 unit price until some amount of time had passed and then the value would increase to $7.00 per unit.

314.    The ledger stated that the $7.00 per unit valuation supposedly came from the "last private placement" price.

315.    A private placement is a method of raising capital by offering equity shares, typically to a select few institutional or high-net-worth investors.

316.    Upon information and belief, this $7.00 per unit last private placement valuation was first used to value Motorskill investments in 2011.

317.    In 2011, Dr. Harris asked Randall Erwin about the sudden 40% increase ($5 to $7) in the valuation of Motorskill investments from that year.

318.    Randall Erwin told Dr. Harris that the last private placement price of $7.00 came from the fact the Motorskill Entities had started selling "Round B" units at $7.00 per unit, which would therefore constitute the last private placement of a Motorskill unit.

319.    Randall Erwin stated that the $7.00 price was a "very conservative" valuation.

320.    Dr. Harris informed Newport of this explanation for the valuation of the Motorskill investments in 2011.

321.    After 2011, Dr. Harris purchased an additional $16 million of Motorskill subscription units at the $5.00 per unit price.

322.    With each of these additional investments, after some time had passed, Motorskill would value the investments at the $7.00 per unit price and include that valuation on the ledgers sent to Newport.

323.    In 2014, Dr. Harris suggested valuing all Motorskill subscription units at $7.00, regardless of how long those investments had been carried.

324.    Dr. Harris made this suggestion to Dennis Kass, Newport's senior relationship manager on the AMEC account since 2008. Dr. Harris's initial justification for this proposed change was that "it would sure help out the first quarter returns."

325.    When Kass expressed some hesitancy about raising the valuation from $5.00 to $7.00, Dr. Harris persisted by asking about "what would the earning look like" if the valuation was increased.

326.    At the end of the conversation, Dr. Harris instructed Kass to "use the $7 value spread over the rest of the year."

327.    Subsequently, Kass was informed by Dr. Harris that Randall Erwin had stated that the Motorskill investments should be valued at the $7.00 per unit price and could be used for all quarters going forward. No other explanation was given.

328.    On this flimsy basis, Newport used the $7.00 valuation when reporting the value of the Motorskill investments to Plaintiffs *for the next seven years with no additional investigation, questioning, or confirmation that the Motorskill investments could be reasonably valued at*

*$7.00 per unit*.

329.    Newport made no further inquiries and issued no disclaimers to Class Members, as Plan participants, about the valuation even though Dr. Harris explicitly framed the discussion and subsequent decision to increase the valuation in terms of how it would improve the reported earnings of the investment.

330.    In addition to valuing the subscription units, the Motorskill subscriber ledgers also delineated how the dividends earned on the Motorskill investments of Plan assets should be valued.

331.    The dividend shares included on the ledgers were labeled liquidity dividends.

332.    By the plain terms of the subscriber ledgers, the ledgers only gave "indications" of the value of the liquidity dividends.

333.    Like the value of the subscription units themselves, the liquidity indications were only based on the last price private placement and not based on any projection of a public market exit strategy.

334.    In other words, upon information and belief, the liquidity indications were projections created internally by Motorskill and not based on any external public market value.

335.    Additionally, the ledgers stated that the liquidity dividends would only be earned and payable at a liquidity event.

336.    A liquidity event would include a merger, acquisition, initial public offering, or other action that would allow early investors like AMEC and Financial Freedom Funds to cash out their subscription units or shares.

337.    The notes concerning liquidity events were plainly apparent in the one-page Motorskill financial statements received by Newport.

338.    No liquidity event occurred between 2005, when the first investment of Plan assets

was made into Motorskill, and 2019, when the last subscriber ledger was issued by Motorskill.

339. Newport never believed that any liquidity event occurred relating to the Motorskill Entities and never had any reason to believe such an event occurred.

340. Newport employees were never directed by anyone outside of Newport to ignore the notes in the Motorskill financial statements concerning liquidity events.

341. Nevertheless, Newport repeatedly reported valuations of Fund assets to Class Members that contained no disclaimer or discounting factor for the value attributable to the Motorskill investments.

342. This is particularly egregious as the dividends that Newport had included in its valuations of the Plan had never been earned nor payable, and thus should not have been included in the valuations.

343. Newport's CPA that was responsible for performing the relevant plan valuations, Fiszer, testified in this case that he simply never read the language that said these liquidity dividends had not yet been earned.

344. Key personnel at Newport took steps to ensure that other individuals would not question Motorskill's implausible and illusory "returns."

345. For instance, in 2005 Yahoudy declared that AMEC's outside investments (including, at a minimum, investments in the Motorskill Entities) were "Guaranteed to Earn 8%". This declaration was included in "Special Handling Notes" for AMEC's client relationship with Newport.

346. This guarantee of 8% returns was false and implausible on its face.

347. The Motorskill Entities held themselves out to be venture capital entities. While legitimate venture capital entities can earn returns of 8% or more, they are subject to far more

volatility and risk than fixed-income investments.

348.    The "Yahoudy Guarantee" suggested that the Plan had been able to find outside investments (including alleged venture capital entities) that could provide returns five times as large as the returns from Symetra annuities without any increase in investment risk.

349.    No financial professional acting in good faith would believe such a claim or endorse such a claim.

350.    Upon information and belief, the purpose of the Yahoudy Guarantee was to discourage uninitiated Newport employees from asking questions about the values assigned to AMEC investments.

351.    In 2014, Newport agreed to manipulate Plan's financial statements to permit Dr. Harris to withdraw $1 million from the Plan as a "loan" without reducing the valuation of the Plan in a manner that could lead Newport to report a quarterly loss in the statements Newport distributed to Class Members.

352.    Newport knew that employers are generally not permitted to borrow money directly from the retirement fund of their employees, yet Newport agreed to cover up this prohibited transaction so that it would not result in a reported loss and possibly trigger additional scrutiny from AMEC or Class Members.

353.    Newport took the position that since the Plan had not technically made the election to be governed by ERISA, there were no applicable legal rules against prohibited transactions and violations of fiduciary duties.

354.    Newport covered up Dr. Harris' prohibited transaction booking the impermissible loan as a "receivable" so that the reported value of the Plan assets did not change.

355.    In October 2015, Newport alerted Dr. Harris that it might be posting a quarterly

loss for the Plan. Newport wanted to know if Harris was "ok with this." Newport also noted that a prior loan to Day & Night Solar had matured and was now due. Newport asked if Dr. Harris planned "on paying this [loan] off at this time" or if Dr. Harris was going to renegotiate the loan.

356.    In response, Dr. Harris stated that he had discussed the Day & Night Solar loan with Eaton and intended to renew the note for 60 days.

357.    Dr. Harris then asked Newport, "What effect would an additional $100K deposit have on the situation?"

358.    Dr. Harris then explained that he was thinking about returning a portion of "expenses" he had withdrawn from the Fund during the last quarter. Dr. Harris stated that he might be in a position to temporarily return some of those funds because "the 4th Q is usually strong due [to] the Motorskill dividends. Let me know if doing so will have a positive effect on the loss for the 3rdQ."

359.    Upon information and belief, Dr. Harris intended to use the fictitious "liquidity event" of Motorskill dividends that were attributed to the Fund at the end of the year to paper over losses and enable him to pull money back out of the Plan after Newport calculated and reported results for the third quarter of the year.

360.    Kass and Yahoudy approved this idea and went a step further by suggesting that in the future Dr. Harris "structure the expense withdrawals to be semiannual (aligned with Motorskill dividend distribution), so we could avoid deferring recognition of expenses on the plan valuation and financial statements."

361.    This was affirmative, unsolicited advice from Newport that Dr. Harris should structure expense withdrawals in a way where Dr. Harris could offset those withdrawals with Motorskill dividends that Newport knew (based on Newport's receipt of Motorskill statements)

did not actually represent earned income.

362.    In response, Dr. Harris authorized Newport to defer over $240,000 in Third Quarter expenses "in order to avoid a loss being shown for the 3rd Quarter.' Dr. Harris specifically indicated that he made this decision "pursuant to" his discussions with Kass and the concurrence of Yahoudy.

363.    Dr. Harris also stated that he would work to implement Newport's advice regarding future structuring of distributions from the Fund.

364.    Additionally, at times Newport directly advised Dr. Harris on how to invest Plan assets.

365.    Newport did so despite stating in its initial engagement letter with the Department that it was only retained as a service provider and was not retained to offer investment advice.

366.    By the general conduct of its business relationship with Dr. Harris, Newport assumed responsibility for and provided investment advice to Dr. Harris about the investment of Plan assets.

367.    For example, in 2013, Dr. Harris expressly sought advice regarding a potential $20 million investment in an oil and gas enterprise, Landcastle Oil and Gas, LP.

368.    Jarrod Erwin was President of Landcastle Oil and Gas, LP.

369.     Landcastle Oil and Gas, LP was owned or managed by the Motorskill Entities.

370.    Dr. Harris sent Yahoudy an investment proposal packet for the potential investment of Plan assets into Landcastle.

371.    After reviewing the relevant documents supplied by Dr. Harris, Yahoudy advised against making the investment with Plan assets because the investment would be in a speculative venture, would minimize the diversification of Plan assets, and was risky.

372. In doing so, Yahoudy compared this investment to an investment into the stock market, where even if the stock price declines, there is an opportunity for recovery in the future.

373. Dr. Harris took Yahoudy's advice and did not make the investment.

374. Later, in 2018, after Dr. Harris's fraudulent scheme had continued to progress until it was nearing a breaking point, Yahoudy helped Dr. Harris renew his fiduciary insurance.

375. Additionally, Newport also misled Rodney Brown, the external CPA contracted by the Department to do the annual audits of the Plan, by sending Rodney Brown confirmations of the Plan's investment value.

376. These confirmation letters were signed by a Newport CPA, Fiszer, and had no disclaimer or explanation about how Newport was valuing the Plan investments.

377. Just as Newport did not disclose the "liquidity event" notes in the Motorskill statements or its implications to Class Members, Newport did not disclose the notes to Rodney Brown.

378. Newport sent Rodney Brown these confirmations at the behest of Dr. Harris.

379. Newport also permitted manual adjustments to the quarterly participant statements of Dr. Harris, Sandra Harris, Christopher Harris, Gloria Peterson, and Dr. Dorothy Young (the wife of Bishop McKinley Young, the chair of the Commission overseeing the Department from 2008-2012).

380. This practice of manual adjustments on insiders' statements began in at least 2008, if not before, and continued for an unknown amount of time.

381. Additionally, in Q4 of 2019, Sandra Harris withdrew $70,000 of the approximately $75,000 in her account.

382. Sandra Harris's withdrawal occurred after Dr. Harris learned that the Motorskill

investments were virtually worthless.

383.    Likewise, in Q4 of 2020, Dr. Harris withdrew approximately $500,000 from his Plan retirement account.

384.    This withdrawal occurred after Newport had stopped receiving statements from the Motorskill Entities about the Plan's investments.

385.    Newport processed each of these withdrawals.

386.    Newport raised no concerns over withdrawals of that size by the people closest to the Plan's regular operations despite the fact the withdrawals occurred after Newport stopped receiving statements from the Plan's largest investment.

387.    Newport was well compensated for its assistance to Dr. Harris's fraudulent scheme. Newport billed AMEC $140,000 a year plus a markup on the distribution of statements to Plan Participants.

388.    Newport estimated in depositions in this case that it spent around 280 hours a year working on matters for the Plan. Therefore, Newport's annual flat fee amounted to roughly $500 per hour.

389.    In September 2021, Kass realized that Newport had actually been overcharging the Plan. Given what was transpiring at that time, he realized that Newport may be under additional scrutiny, particularly since these fees were deducted from the funds maintained by Symetra. Despite knowing that Newport had been overcharging the Plan, Newport made no effort to notify anyone at AMEC about the overcharging or to correct Newport's overcharging.

390.    Newport's annual fee from AMEC was about five times the size of the second largest fee charged by Newport to a client.

391.    Many Newport clients are also clients of Symetra.

392.    Symetra and Newport personnel regularly collaborate to jointly serve clients.

393.    Newport's close working relationship with Symetra gave it a strong incentive to cooperate with any scheme Symetra was involved in.

394.    Newport's close working relationship with Symetra gave Newport a strong incentive not to ask any questions or reveal any information that would reflect poorly on Symetra or a client of Symetra.

395.    As one of its final acts in furtherance of the scheme, Newport facilitated the full rollover of funds for several individuals, including over $500,000 for a bishop, at Dr. Harris's request after he had retired and no longer had any authority to direct Newport's actions.

396.    Leading up to his retirement in June 2021, Dr. Harris emailed his contacts at Symetra and Newport to let them know that he would officially be retiring at the upcoming Quadrennial Conference.

397.    Then, on July 18, 2021, after Dr. Miller was elected as the new executive director at that conference, Dr. Harris notified Symetra and Newport that Dr. Miller had been elected executive director on July 11, 2021, "effective as of that date."

398.    On July 28, 2021, Dr. Harris sent a letter to Newport requesting rollovers and disbursements for eight Plan participants, including over $513,850 to be withdrawn as a rollover for Defendant Davis.

399.    Newport followed Dr. Harris's direction and directed Symetra to release those funds, without confirming with Dr. Miller that Dr. Harris still had authority to make such a request, despite knowing that Dr. Miller had been the new executive director for over two weeks by this point.

400.    Symetra, with the same knowledge as Newport, then proceeded to disburse the

funds to these eight Plan participants.

**E. Defendant Symetra Assists Dr. Harris's Fraudulent Scheme**

401.    In March 2008, about seven years after AMEC opened an annuity investment account with Symetra with more than $48 million in Plan assets, Dr. Harris initiated a $10 million withdrawal from the fixed annuity account at Symetra, intending to transfer those millions of dollars to Financial Freedoms Funds, LLC.

402.    Freedom Funds was the investment entity formed by Dr. Harris in 2006.

403.    Symetra employees discussed the intended $10 million transaction internally, recognizing the size of the withdrawal and wanting to conserve the millions of dollars of Plan assets invested with Symetra.

404.    While discussing the transaction, a Symetra employee, Jon David Parker, noted that the money was going to be transferred to a fund he believed was controlled by Eaton.

405.    Parker noted that Defendant Eaton was the broker on the AMEC account.

406.    Emailing internally within Symetra, another Symetra employee, Jim Daniel, stated, "It appears they are moving this portion of the plan to another investment. I have asked bob to get some info. He and mark y are going to talk. I am suspicious that this could be a prohibitive [sic] transaction."

407.    Daniel's reference to "mark y" was to Mark Yahoudy, a managing director at Newport on the AMEC account, and his reference to "bob" was to Bob Follette, a Symetra employee who worked on the AMEC account.

408.    Follette also recognized the improper nature of the transaction. When Follette alerted Daniel about Eaton's request to wire the $10 million, he added, "This looks like Bob [Eaton]'s own LLC that the AMEC plan is funding."

409.    Follette subsequently discussed the transaction directly with Dr. Harris.

410.    Thereafter, Follette recommended that Dr. Harris have a qualified ERISA attorney review the arrangement (i.e., the transfer of $10 million in Plan assets to an investment entity formed by Dr. Harris and controlled or managed by Eaton) before proceeding to ensure that no prohibited transactions or harm to the plan resulted from the $10 million transfer.

411.    Follette specifically warned about the ownership structure of Freedom Funds and any compensation or benefits accruing to interested parties such as Dr. Harris and Eaton.

412.    Nevertheless, Follette simultaneously stated that Symetra would proceed with the transaction and stated Dr. Harris should contact them or Yahoudy of Newport with any questions.

413.    When Dr. Harris responded to this email, he did not promise to obtain legal advice or state that a lawyer had reviewed and approved the proposed transaction. Instead, he merely stated that "I really appreciate your input and concern, particularly as it relates to my fiduciary responsibilities."

414.    Symetra allowed that transaction to go through and $10 million was transferred to Freedom Funds.

415.    Upon information and belief, most of the $10 million was later invested by Freedom Funds into the Motorskill Entities in subsequent years.

416.    On a different front, just a month later, Symetra helped Dr. Harris get re-elected to his position as Executive Director of the Department.

417.    The role of Executive Director was an elected position within AMEC and elections take place every four years at the AMEC General Conference.

418.    AMEC members would campaign for this particular position by touting their financial and managerial experience or, in Dr. Harris's case, their contributions to the growth of

the Plan.

419.    Symetra had found a lucrative relationship with Dr. Harris and wanted to ensure that relationship continued even as it was aware of his self-dealing and misdeeds.

420.    Accordingly, in April and May of 2008, Symetra helped draft and revise a Campaign Mailout Brochure for Dr. Harris's re-election campaign.

421.    Symetra employees added details and statistical information to the brochure about the successes of the Plan's growth and made editorial suggestions about how to tout the improved efficiency and administration of the Plan.

422.    Indeed, Symetra employees from various departments (marketing, retirement plan distribution, etc.) redlined and commented on the brochure.

423.    Moreover, Symetra wanted to showcase the asset growth during Dr. Harris' tenure as Executive Director, a tenure which started the relationship between AMEC and Symetra.

424.    To do so, Symetra worked with Newport to collect data about the total Plan assets between 2001 and 2007 to make a graph that would display the unverified fictitious growth achieved during Dr. Harris's tenure.

425.    Symetra employees also took steps to conceal their assistance to Dr. Harris's reelection campaign.

426.    Symetra employees removed any Symetra logos or other identifying information from the brochure for the explicit purpose of not being perceived as endorsing Dr. Harris's re-election campaign.

427.    Symetra wanted anyone looking at the brochure to think that the brochure only came from Dr. Harris himself despite Symetra having a vested interest in Dr. Harris's re-election.

428.    This particular brochure also represented that RSM McGladrey (Newport's

predecessor) was engaged to provide independent auditing of the retirement plan, thus purportedly providing critical third-party oversight of plan management and administration.

429.    Due to the close working relationship between Symetra and RSM McGladrey/Newport in general and relating specifically to AMEC, Symetra had actual knowledge that Newport was not providing independent audits of the Plan.

430.    Symetra also helped to facilitate Dr. Harris's efforts to skim funds from the Plan by sending him the quarterly "admin" fee checks via check, instead of wiring them directly to the Plan's bank accounts.

431.    As a result of Symetra's decision to send Dr. Harris checks, Dr. Harris would take the  check to the bank, cash it, deposit some of the funds in the Department account (nearly always in an even, round number), and do as he wished with the rest, which was typically deposited into a Trinity bank account.

432.    Throughout its interactions with Dr. Harris, Symetra made no effort to ensure that Dr. Harris was operating within the scope of his authority.

433.    In fact, Symetra continued to approve distribution requests from Dr. Harris even after Symetra received actual notice in July 2021 that Dr. Harris had retired from AMEC and been replaced as trustee by Dr. Miller.

434.    For instance, on August 3, 2021, a Newport supervisor approved Dr. Harris's request for a distribution of more than $500,000 from the Fund as described above, a request that hadn't even been made to Newport by Dr. Harris until two weeks after he told Newport and Symetra that Dr. Miller had been elected as the new executive director and trustee, effective July 11, 2021.

F.      **Dr. Harris's False Representations to Class Members About the Plan.**

435.    Throughout the early 2000s and until the Relevant Time Period, Dr. Harris would routinely publish written materials and present those materials at annual conferences and meetings on the condition of the Fund and its investments.

436.    However, from 2001 to 2021, Dr. Harris created various entities and/or used pre-existing entities, purportedly to perform services for the Department and/or Plan, but in fact to divert Department and/or Plan funds to engage in self-dealing and other illegal acts.

437.    A common cover story for these diversions was that these various entities were performing services for the Department and/or Plan.

438.    The AME Church established a "General Board" in 1956 to guide the AME Church.

439.    The General Board Orientation Handbook, issued for each four-year period between the Church's Quadrennial Sessions, requires the General Board to hire an auditor to conduct an annual audit of the Department, including with respect to the contributions and investments in the Plan.

440.    The Handbook further states that the General Board is to require the Plan's Executive Director to provide each General Board member a report on the Plan and its assets one month before the annual General Board Meeting.

441.    In July 2016, at the 50th Quadrennial Session General Conference of the AME Church, Dr. Harris reported on the status of the Plan.

442.    In his report, Dr. Harris thanked Plan participants "for their continued confidence in [the] efforts to provide for their retirement future."

443.    Dr. Harris went on to praise the "personal commitment and the sacrificial support of the churches that [the Plan participants] serve" as the reason that "the AMEC Retirement Plan has continued to experience unparalleled growth and financial success for more than fifty-two

years."

444.    In his July 2016 presentation, Dr. Harris reported that at the beginning of fiscal year 2015, the Plan had a total value of $113,388,374.50 and as of the fiscal year end had grown to $117,521,777.23.

445.    In 2017, Dr. Harris again reported on the financial condition of the Plan. In this presentation he showed a bar graph indicating significant growth in Plan assets between 2012 and 2017 as follows:



446.    In his overview, Dr. Harris stated that the last twelve months had been a time of turmoil and uncertainty, which had an impact on the financial markets both in the United States and globally. He further stated that it was because of this uncertainty and market instability that the Department "has continued to adhere to a conservative investment strategy which has been in place since 2001. It is a strategy that has resulted in the continuous and consistent growth of the AMEC Ministerial Retirement Annuity Plan portfolio as reflected in the following pages of this report."

447.    Dr. Harris's 2017 report represented that as of fiscal year end 2017 the Plan portfolio total value was $119,800,961.03.

448.    The report of the Department of Retirement Services for 2016/2017 represented that "Symetra Financial and Retirement Services Company" is the investment company through which Plan annuity investments are purchased.

449.    The 2016/2017 Department of Retirement Services report represented that "[a]s of March 31, 2017 and 2016, the total account balances of annuities held and invested on behalf of the clergy servants and full-time employees of the African Methodist Episcopal Church was $119,801,000 and $117,522,000."

450.    At the General Conference held in Orlando, Florida in July 2021, Dr. Harris and AMEC told Conference attendees that the balance of the Plan's assets were nearly $130,000,000.

451.    While Dr. Harris's representations often attempted to reassure Plaintiffs and Class Members that their funds were being invested in a conservative, protected manner, later audits and investigations revealed that AMEC (through Defendants Davis, Green and others, including without limitation Defendants Individual Does 1-10 and Corporate Does 1-10) and the third-party administrators it had hired to help oversee and administer the Fund had failed to properly oversee

or manage the funds invested by Plaintiffs and the putative class into the Plan.

**G. AMEC's Alleged Discovery of Dr. Harris's Scheme**

452.    AMEC has publicly stated that it only learned of Dr. Harris' scheme in June 2021, upon his retirement and as part of the transition to new Department leadership.

453.    Each Plaintiff had funds contributed to the Plan on their behalf by AMEC. Those funds were vested benefits for all Plaintiffs due to the length of their respective service.

454.    The Fund was making disbursements until summer 2021.

455.    Rev. Pearce Ewing and other Plaintiffs and putative class members received a letter from the Plan dated September 14, 2021, notifying them that disbursements would be temporarily paused while the Plan was audited due to a change in leadership.

456.    The letter indicated that this audit would take 4-6 weeks.

457.    In approximately the first week of November 2021, AMEC sent a second letter to Plaintiffs and Class members indicating that the audit was not finished and therefore disbursements still could not be made.

458.    Later audits and subsequent communications revealed that of the approximately $130,000,000 in assets represented to have been invested into the Plan (and/or which were purportedly held in conservative investment funds and portfolios), some $90,000,000 was unaccounted for by 2021.

459.    Details of imprudent, illogical, speculative, and highly risky investments of Plan assets followed, indicating that AMEC and the Plan management failed to adequately protect the interests of the Plaintiffs and their retirement savings.

460.    For example, on January 31, 2022, a meeting of the General Board confirmed that the Plan had, in fact, lost more than $90 million, with the exact amount unknown. The meeting

was recorded and publicly available on the internet.

461.    At that meeting, it was reported that as recently as June 30, 2021, the Fund had been represented to have a value of $126,800,000.

462.    More than $90 million of this $126.8 million was now known to be missing, and the Church stated that no one connected with the Church, except Dr. Harris, knew where the money and other Plan-related records went.

463.    Those attending the January 31, 2022, meeting were told that despite repeated representations to Plan participants over the last two decades, the Plan's assets were not all invested in annuities provided by Symetra.

464.    Meeting attendees were also informed that the Council of Bishops, General Board, Department of Retirement Services, the chair of the Department, Bishop Green, and the Trustees allowed a single individual, Dr. Harris, to exercise full decision-making authority over the use of all Plan assets.

465.    Dr. Miller, Dr. Harris's replacement as Executive Director of the Department of Retirement Services, promised that "never again will we allow one person to count the money."

466.    This statement in and of itself concedes that the AMEC Defendants completely abdicated their fiduciary duties owed to the Plan and the Plan's participants, including Plaintiffs and Class members.

467.    At the meeting on January 31, 2022, Dr. Miller informed the attendees of the meeting that the office of the Executive Director of the Department of Retirement Services had been emptied, with nothing in the office cabinets but "empty files and paperclips." Even the most current version of the Plan document could not be located.

468.    Upon investigation into the missing assets, AMEC stated that it learned that tens of

millions of dollars had been supposedly diverted into high-risk, speculative, imprudent, and/or fraudulent investments and loans to financial entities that were created, controlled, and/or owned by Defendants Dr. Harris and Eaton.

469.    The AMEC investigative committee reported that they had only been able to verify about $38,000,000 in existing Plan assets: $36,900,000 of the Plan assets invested with Symetra, along with about $1,000,000 of value in an investment in a speculative, high-risk investment in undeveloped real estate located in Key Marco Island, Florida.

470.    AMEC, Bishop Green, Bishop Davis, AMEC Department of Retirement Services, AMEC General Board, and AMEC Council of Bishops violated their fiduciary duties by failing to ensure that a sufficiently well-qualified and respected auditor was engaged for the task of auditing and performing due diligence on the Plan. They also failed to ensure that the auditor they hired to audit the Department had any insurance, let alone in a sufficient amount to cover any negligence by the auditor.

471.    Rodney Brown lacked the size, experience, resources, and industry qualifications to audit an entity with the size and importance of the Department. Rodney Brown also failed to have any insurance coverage for its work.

472.    As alleged above, tens of millions of dollars of the Plaintiffs' and Class members' retirement funds have been moved into speculative and unsafe investments with disastrous results.

473.    Even the funds that were invested in legitimate and safer investment vehicles generated returns that were woefully below that required by the Department of Labor to provide sufficient retirement security.

474.    These breaches of fiduciary duty harmed the Plaintiffs and the putative class.

475.    Dr. Harris retired in 2021.

476.    The current Executive Director of the Department of Retirement Services is Dr. James F. Miller.

477.    Dr. Miller has continued Dr. Harris' practice of violating AMEC bylaws and rules by withdrawing a percentage of the Fund each year for administrative fees.

478.    AMEC bylaws and rules limit the collection of fees to 2% of *contributions*, rather than a percentage of the entire fund.

479.    Dr. Miller has no legitimate basis for ignoring those bylaws and rules.

480.    AMEC now denies all responsibility for the calamity that has befallen Plaintiffs.

481.    AMEC instead places all blame on Dr. Harris, Symetra, Newport, and Dr. Harris's associates.

482.    AMEC asserts that Dr. Harris repeatedly represented to AMEC "a deceptive, false, and grossly inflated value for the Annuity Plan." *See* https://religionnews.com/2022/05/26/ame-church-files-lawsuit-against-dr-harris-and-others-for-embezzlement-and-fraud/.

483.    The fraudulent scheme orchestrated by Dr. Harris relied on the systematic shirking of fiduciary duties by Defendants AMEC, AMEC General Board, AMEC Council of Bishops Department of Retirement Services, Bishop Davis, and Bishop Green, as well as the misconduct of others as described throughout this complaint.

484.    These Defendants failed to prudently select, retain, and monitor the appointed fiduciaries of the Fund and the investments made by the Fund.

485.    Accordingly, these Defendants breached their fiduciary duties to follow the terms of the Plan.

## **PLAINTIFFS' SPECIFIC ALLEGATIONS**

486.    Each Plaintiff has been told that the balance of his or her respective retirement benefits are approximately 30% of what they were represented to be in July 2021.

487.    Each Plaintiff has been denied access to the full amount of their account balances.

488.    After Rev. Pearce Ewing retired in September 2021, he attempted to access his retirement funds from the Plan. At that time, he was denied access to his money.

489.    Rev. Pearce Ewing has since learned that he may be left with a mere fraction of the funds that he reasonably expected to receive.

490.    Because he is unable to rely on his retirement benefits, Rev. Pearce Ewing has been forced to make ends meet by driving large commercial trucks at night.

491.    Rev. Pearce Ewing has suffered severe emotional distress as a result.

492.    Similar to Rev. Pearce Ewing, Rev. Wade has also been told that a significant portion of the Fund is missing and that he cannot access or rollover his funds into an IRA.

493.    Rev. Wade suffered severe emotional distress as a result.

494.    Presiding Elder Russ, Rev. King, and Rev. Matthew Ewing also attempted to access their monies in the Pension Fund around September 14, 2021, when they received the letter from AMEC regarding stopped disbursements and the audit. These three also received the follow-up letter in November 2021 from AMEC, just like Rev. Pearce Ewing and others.

495.    Presiding Elder Russ, Rev. King and Rev. Matthew Ewing also suffered severe emotional distress as a result.

496.    Rev. Jackson similarly received the form letter from AMEC dated September 14, 2021, notifying him that disbursements would be temporarily paused while the Fund was audited.

497.    Rev. Jackson is over 70 years old and planned to rely on the usage of these funds in his retirement.

498.    On September 29, 2021, shortly after his retirement, Rev. Jackson mailed a written request to release his funds held by the Fund, which was denied.

499.    Rev. Jackson likewise suffered severe emotional distress as a result.

500.    On September 13, 2021, Presiding Elder Alexander completed and signed an Authorization for Distribution form requesting a direct rollover of his Fund plan assets to an Individual Retirement Account.

501.    On October 8, 2021, Presiding Elder Alexander sent an email to Rev. Miller following up on this request.

502.    At that time, Presiding Elder Alexander was informed that the rollover was held up due to a pending audit and that the Fund's funds had been frozen.

503.    In 2022, Defendant AMEC rolled over to his IRA approximately 1/3 of the amount indicated in his last account statement pursuant to his Authorization for Distribution form completed in September of 2021.

504.    Presiding Elder Alexander also suffered severe emotional distress as a result.

505.    Rev. Carmichael and Rev. Conley both received AMEC's September 14, 2021, and November 9, 2021, letters regarding the audit and pausing of disbursements.

506.    Both Rev. Carmichael and Rev. Conley have been unable to access their funds and have been told that the recent balance owed to them is significantly less than what they earned and were entitled to.

507.    For example, Rev. Carmichael's account statement for the period of April 1, 2021, through June 31, 2021, showed an account balance of $107,989.04. In stark contrast, as of May 19, 2022, the online portal (maintained by Newport) showed a balance of $32,442.24.

508.    Like the other Plaintiffs, Rev. Carmichael and Rev. Conley suffered severe emotional distress as a result.

509.    AMEC ministers and other employees, like Plaintiffs, have wrongly been denied

access to their retirement funds. Further, they are now being told by AMEC that their retirement funds may be as much as 80% lower than was represented in June 2021. Even the June 2021 statements likely concealed years of disastrous returns that were far below even conservative rates that should have been obtained by the Fund had Defendants been properly adhering to their fiduciary duties they owed Plaintiffs and the putative class members.

## CLASS ACTION ALLEGATIONS

510.    Plaintiffs bring this action individually, derivatively on behalf of the Plan, and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), (b)(2), and/or 23(b)(3) seeking injunctive and monetary relief for Defendants' misconduct, as alleged herein.

### I.    Class Definition

511.    Plaintiffs bring this action on behalf of the following class:

All persons residing in the United States who are participants in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, all persons residing in the United States who are beneficiaries entitled to benefits as of January 1, 2021 under the African Methodist Episcopal Church Ministerial Retirement Annuity Plan. Any Defendant employees who have responsibility or involvement in the administration of the Plan, or who are subsequently determined to be fiduciaries of the Plan, and their beneficiaries are excluded from the Class

512.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses under Rule 23(c)(5), or modified in any other way.

513.    Plaintiffs are members of the Class they seek to represent.

514.    The misconduct challenged herein has been and is continuing in nature.

### II.    Rule 23(a) and Rule 23(b)(3) Requirements

#### A.    Numerosity

515.    There are thousands of members of the proposed Class, who are geographically

located throughout the United States.

516.    There are over 5,000 ministers and other AMEC employees impacted by the factual allegations contained in this Complaint.[5]

517.    The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through AMEC's and Newport's corporate records.

518.    The number of class members are so numerous that joinder of all members is impracticable.

519.    The identification of Class members is ascertainable through Defendants' maintained records.

**B. Commonality**

520.    The prosecution of the claims herein will require the adjudication of numerous questions of law and fact common to the Class. The common questions of law and fact predominate over any questions affecting only individual Class members. The common questions include but are not limited to:

a.    Whether Dr. Harris is a fiduciary under state law and had discretionary authority or control with respect to management and disposition of the Plan's assets and operation and management of the Plan.

b.    Whether Bishop Davis is a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan.

c.    Whether Bishop Green is a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and

---

[5] *See* https://www.bet.com/article/mp3ze7/ame-church-suspended-payments-retirees.

management of the Plan.

d.      Whether the General Board is a fiduciary under state law and had discretionary authority or control respecting management and disposition of the Plan's assets and operation and management of the Plan.

e.      Whether the Defendants breached their fiduciary duties to the ministers and other AMEC employees that participated in the AMEC's retirement plan;

f.      Whether Defendants fraudulently concealed their respective breaches of fiduciary duties;

g.      Whether the Defendants fraudulently concealed the actions of Dr. Harris and other Defendants regarding the mismanagement of and missing funds from the Pension Fund;

h.      Whether the Defendants were negligent in failing to perform adequate due diligence and management in relation to the Fund;

i.      Whether Dr. Harris converted Plaintiffs' funds in the Pension Fund;

j.      Whether Defendants must be held to the duties set forth in the Plan documents;

k.      Whether Defendants breached their duty of loyalty owed to Plaintiffs and violated Tennessee Uniform Trust Code;

l.      Whether Defendants have failed to administer, fund and otherwise operate the Plan in accordance with ERISA;

m.      Whether and to what extent Plaintiffs were damaged by the Defendants' misconduct challenged herein;

n.      The appropriate measure of damages to which the Plaintiffs are entitled; and,

o.      Whether the Plaintiffs are entitled to accounting of the Fund.

p.      Whether Defendants Newport, Symetra, Dr. Harris, Robert Eaton, Financial

Freedom Funds, LLC, Financial Freedom Group, Inc., Day and Night Solar, Financial Technologies, LLC, and the Motorskill Entities conspired together in a scheme that was intended to accomplish an unlawful purpose by concerted action.

q.    Whether Dr. Harris and his co-conspirators shared a common plan or design, were aware of the common plan or design and knew of the intent of the other co-conspirators to participate in that common plan or design.

r.    Whether Dr. Harris and his co-conspirators committed overt acts in furtherance of and provided substantial assistance to the conspiracy.

s.    Whether Defendants Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Day & Night Solar, Trinity Financial Consultants, LLC, the Motorskill Entities, Eaton, and Sandra Harris knew that Dr. Harris owed a fiduciary duty to Plaintiffs, other Class Members, and the Plan.

t.    Whether Defendants Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Day & Night Solar, Trinity Financial Consultants, LLC, the Motorskill Entities, Eaton, and Sandra Harris provided substantial assistance or encouragement to aid in Dr. Harris' breach of fiduciary duty to Plaintiffs, other Class Members, and the Plan.

## C. Typicality

521.    All Class members were subject to the same misconduct as alleged herein, all are similarly affected by Defendants' wrongful conduct, and their injuries arise out of the same wrongdoing.

522.    Plaintiffs' claims are also typical of the claims of the other members of the Class because, to the extent Plaintiffs seek equitable relief, it will affect all Class members equally.

523.    All Class members were injured and continue to be injured in the same manner by

the alleged breaches of fiduciary duty.

524.    Plaintiffs have no interests that are antagonistic to the claims of the Class.

525.    Plaintiffs understand that this matter cannot be settled without the Court's approval.

526.    AMEC does not have any defenses unique to Plaintiffs' claims that would make Plaintiffs' claims atypical of the remainder of the Class.

## D.  Adequacy of Representation

527.    Plaintiffs are adequate representatives of the Class.

528.    Plaintiffs' interests are coextensive with those of the members of the proposed Class. Plaintiffs are willing and able to represent the proposed Class fairly and vigorously.

529.    Plaintiffs have no interests antagonistic to, or in conflict with, the other Class members, and will fairly and adequately protect the interests of the Class.

530.    Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

531.    Plaintiffs have retained counsel highly skilled in complex class litigation, and in benefits-related class actions in particular, who are qualified, experienced, and able to conduct this litigation.

## E.  Rule 23(b)(1) Requirements

532.    The requirements of Rule 23(b)(1)(A) are satisfied because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

533.    The requirements of Rule 23(b)(1)(B) are satisfied because adjudications of these claims by individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede the

ability of other members of the Class to protect their interests.

### F. Rule 23(b)(2) Requirements

534.     Class action status is also warranted under Rule 23(b)(2) because Defendants have

acted or refused to act on grounds generally applicable to the Class, thereby making appropriate

final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a

whole.

### G. Rule 23(b)(3) Requirements

535.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under

(b)(3) is appropriate because questions of law or fact common to members of the Class

predominate over any questions affecting only individual members.

536.      A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

537.     Given the nature of the allegations, no class member has an interest in individually

controlling the prosecution of this matter.

### <u>CLAIMS FOR RELIEF</u>

538.     In addition to bringing the following claims individually and on behalf of the Class,

Plaintiffs bring the following claims derivatively on behalf of the Plan.

539.     Both Tennessee law and ERISA (which the Plan is required to be operated in

accordance with)  allow Plan participants and their beneficiaries to sue on their own behalf and on

behalf of the Plan for appropriate relief.

540.     Plaintiffs have not made a pre-suit demand upon the Plan's current Trustee, Dr.

Miller, to prosecute these claims on behalf of the Plan.

541.     Plaintiffs' lack of a pre-suit demand is excused because Dr. Miller is employed by

AMEC and answers to AMEC, AMEC Department of Retirement Services, AMEC General Board,

and the Council of Bishops.

542.    Dr. Miller therefore lacks independence in this dispute and has a conflict of interest that would prevent him from vigorously prosecuting these claims in a matter that establishes the liability of his employer and exposes his employer's disreputable actions.

543.    Dr. Miller's lack of independence and conflict of interest is demonstrated by the fact that he has continued Dr. Harris's practice of assessing administrative fees against the entirety of the Fund's balance at Symetra without appropriate authority.

544.    Due to Dr. Miller's lack of independence and conflict of interest, Plaintiffs' lack of pre-suit demand is excused as futile.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against AMEC, AMEC Department of Retirement Services, AMEC General Board,**
**AMEC Council of Bishops, Bishop Green, Bishop Davis, Estate of Dr. Harris, Eaton,**
**Newport, and Symetra)**

545.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 545 as if fully set forth herein.

546.    Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, Dr. Harris, Bishop Green, Bishop Davis, and the AMEC Council of Bishops owed the Plan and its participants fiduciary duties because they all had substantial discretion and control over the Plan's assets and communications with Plan participants.

547.    Defendants AMEC, the AMEC General Board, and the AMEC Council of Bishops owed Plaintiffs and other Class members fiduciary duties because they were charged with, *inter alia*:

a)    Appointing and removing the Trustee and the general administrator of the Plan as necessary for the proper administration of the Plan;

b) Managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence required of fiduciaries pursuant to common law and state law; and

c) Monitoring the selection of the Plan's investments, and the investments themselves, and the performance of all Plan fiduciaries and other persons to whom duties had been delegated under the provisions of the Plan or procedures established to administer the Plan.

548.    AMEC, the AMEC General Board, and the AMEC Council of Bishops breached their fiduciaries duties by, *inter alia*:

a) Failing to remove Dr. Harris and/or the leadership of the AMEC Department of Retirement Services (including Bishop Green and Bishop Davis) for their failures to properly administer the Plan;

b) Failing to conduct the necessary monitoring and due diligence to ensure that the Plan was being operated for the exclusive benefit of the Plan participants and their beneficiaries;

c) Failing to monitor the selection and performance of the Plan's investments;

d) Failing to adequately and thoroughly review the performance of all other fiduciaries of the Plan in a timely manner; and.

e) Permitting Dr. Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

549.    As the general administrators of the Plan, AMEC Department of Retirement Services, Bishop Green, and Bishop Davis owed Plaintiffs and other Class members fiduciary

duties because they were charged with, *inter alia*:

   a) Determining all questions relating to the eligibility of AMEC employees to participate or remain a participant in the Plan and to receive benefits under the Plan;

   b) Computing, and certifying the amount and kind of benefits to which any Plan participant would be entitled, and directing the Trustee with respect to the same;

   c) Authorizing and directing the Trustee with respect to all discretionary or otherwise directed disbursements from the Fund;

   d) Maintaining all necessary records for the administration of the Plan;

   e) Making and publishing rules for regulation of the Plan;

   f) Determining the size and type of any contract to be purchased from any insurer, bank, issuer or other financial institution and designating the financial institution from which to purchase any such contract;

   g) Computing and certifying to AMEC and Dr. Harris the sums of money necessary or desirable to be contributed to the Plan; and

   h) Keeping a record of all actions taken and all other books of account, records, policies, and assorted data that may be necessary for proper administration of the Plan.

550.    As the general administrators of the Plan, AMEC Department of Retirement Services, Bishop Green, and Bishop Davis breached their fiduciary duties by, *inter alia*:

   a) Failing to exercise an appropriate duty of care in monitoring the Trustee's withdrawals and disbursements from the Fund;

   b) Failing to maintain all necessary records to administer the Plan in a manner that would reasonably protect the Plan from mismanagement, self-dealing, embezzlement, or other misconduct by Plan fiduciaries;

c)    Failing to make and publish rules for regulation of the Plan in a manner reasonably calculated to protect the Plan from mismanagement, self-dealing, embezzlement, or other misconduct by Plan fiduciaries;

d)    Failing to exercise sufficient oversight over the selection of Symetra as annuity provider and the terms of the contract with Symetra;

e)    Failing to exercise sufficient oversight over Symetra's payment of administrative fees out the Fund balance to Dr. Harris.

f)    Failing to conduct the due diligence and monitoring necessary to accurately compute and certify the sums of money necessary or desirable to be contributed to the Fund;

g)    Failure to keep a record of all actions taken, books of account, policies, and assorted data in a manner reasonably calculated to protect the Plan from mismanagement, self-dealing, embezzlement, or other misconduct by Plan fiduciaries; and

h)    Permitting Dr. Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Plan.

551.    As the third-party administrator of the Plan, Newport owed the Plan and its participants fiduciary duties because it had substantial discretion and control over the management and oversight of the Plan's assets and each Plan participant's balance.

552.    Newport breached its fiduciary duties by, *inter alia*:

a)    Failing to require all regular financial statements from all Plan investments;

b)    Continuing to report Plan investments as maintaining their full value even after Plan investments stopped providing regular financial statements;

c)    Reporting fictitious dividends as earned income despite the fact that Newport had

received financial statements stating that such dividends had not actually been earned.

d)   Advising Dr. Harris how to use fictitious dividends to offset actual withdrawals and disbursements from the Fund;

e)   Failing to ensure that all investments made by the Plan were made by a Plan representative acting within the scope of his authorization; and

f)   Permitting Dr. Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Plan.

553.   Symetra owed the Plan and its participants fiduciary duties because it had "authority or control respecting management or control of [Plan] assets."

554.   Symetra breached its fiduciary duties by, *inter alia*,

a)   Failing to establish and/or maintain controls, processes, and procedures in a manner consistent with trust law standards and reasonably calculated to protect the Plan from mismanagement, self-dealing, embezzlement, or other misconduct by Fund fiduciaries

b)   Failing to adequately ensure that all withdrawals and disbursements from the Fund were made by a Plan representative acting within the scope of his authorization; and

c)   Permitting Dr. Harris and his co-conspirators (as a result of the failures enumerated above) to engage in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Fund.

555.   Eaton owed the Plan and its participants fiduciary duties because he acted as a paid investment advisor for the Plan and exercised discretionary control or authority over plan assets.

556.   Eaton breached his fiduciary duties by, *inter alia*,

a)  Engaging in self-dealing by recommending investments in which he had a personal
interest; and

b)  Recommending investments that were extraordinarily speculative and imprudent for
the Fund and exposed the Participants of the Plan to an intolerable amount of
investment risk.

557.  Defendants' conduct, including poor oversight, control, and management, was
fraudulently concealed from Plan participants until January 2022 when it was first revealed to Plan
participants that 70% to 80% of the Plan's assets were missing.

558.  As managers and professional advisors of the Plan, Defendants owed fiduciary
duties to the Plan and its participants.

559.  The Defendants breached their fiduciary duties to the Plan and its participants by
failing to adequately manage the Fund.

560.  The Defendants breached their fiduciary duties to the Plan and its participants by
failing to protect the assets of the Plan so as to ensure the retirement security of Plaintiffs and the
Plan Participants.

561.  The Plan and its participants have been damaged as a proximate result of
Defendants' breaches of fiduciary duty and are entitled to damages, and appropriate equitable
relief, including but not limited to, surcharge, disgorgement of profits, estoppel and an accounting.

562.  The Plan and the Plan Participants are entitled to punitive damages as Defendants'
breaches of their fiduciary duties were a gross dereliction of their duties and Defendants acted
either intentionally, fraudulently, or recklessly in committing their breaches.

563.  Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring
this claim on the Plan's behalf.

564.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

565.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

### COUNT II
### Claim for Violation of Tennessee Uniform Trust Code For Breach of Trust and Misappropriation of Trust Funds
### (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)
### (Against Estate of Dr. Harris, AMEC, Newport, Symetra, and Eaton)

566.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 – 545 as if fully set forth herein.

567.    The Plan's assets (the Fund) are held in trust for the benefit of Plaintiffs and the Class members.

568.    AMEC agreed and represented in writing in the Plan document and Summary Plan Description that "The Plan and Trust will be governed by the laws of the State of Tennessee."

569.    Plaintiffs and the other Class members are beneficiaries of the Plan and the Trust

570.    Dr. Harris is a fiduciary and trustee within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

571.    Eaton is a fiduciary and trustee within the meaning of the Tennessee Uniform Trust Code, Tenn. Code Ann. §§ 35-15-103(13) and 35-15-103(20).

572.    Under the Tennessee Uniform Trust Code, "A trustee shall take reasonable steps to

take control and protect the trust property." Tenn. Code Ann. § 35-15-809.

573.   Under the Tennessee Uniform Trust Code, "A trustee shall administer the trust solely in the interests of the beneficiaries." Tenn. Code Ann. § 35-15-802.

574.   Trustees also owe a duty of loyalty to trust beneficiaries. *See* Tenn. Code Ann. § 35-15-802 ("(a) A trustee shall administer the trust solely in the interests of the beneficiaries. (b) …a sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise affected by a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected the transaction").

575.   Dr. Harris's investments of Plan assets in low-performing annuities, high-risk venture firms and undeveloped real estate were made in order to benefit Dr. Harris and Eaton.

576.   Dr. Harris's and Eaton's use of Plan assets to pay for illusory and/or fraudulent services from entities in which Dr. Harris and/or Eaton held a financial interest was done in order to benefit Dr. Harris and/or Eaton.

577.   Dr. Harris's decision to keep Plan assets invested with an annuity provider that was willing to pay him kickbacks was done in order to benefit Dr. Harris.

578.   Eaton's decision to keep Plan assets invested with an annuity provider that was willing to pay him significant commissions was done in order to benefit Eaton.

579.   Dr. Harris's decision to withdraw a substantial part of his retirement assets from the Plan before the Plan's losses became public knowledge was done in order to benefit Dr. Harris.

580.   Eaton's use of Plan assets to fund loans to entities that he owned and/or controlled was done to benefit himself.

581.   Accordingly, misappropriation of Plan assets constitutes misconduct of the highest

order.

582.     Dr. Harris's self-dealing violated TN Code § 35-15-802(b).

583.     Eaton's self-dealing violated TN Code § 35-15-802(b).

584.     For purposes of the Tennessee Uniform Trust Code, a "fiduciary" means "[a] trustee, conservator, guardian, agent under any agency agreement or other instrument, an executor, personal representative or administrator of a decedent's estate, or any other party, including a trust advisor or a trust protector, who is acting in a fiduciary capacity for any person, trust, or estate." Tenn. Code Ann. § 35-15-103(13)(A).

585.     For purposes of the Tennessee Uniform Trust Code, "[a] trust protector or trust advisor is any person, and may be a committee of more than one person, other than a trustee, who under the terms of the trust, an agreement of the qualified beneficiaries, or a court order has a power or duty with respect to a trust." Tenn. Code Ann. § 35-15-1201(a).

586.     Tenn. Code Ann. § 35-15-1201(a) contains a nonexclusive list of powers or duties that can make a person a trust advisor.

587.     For purposes of the Tennessee Uniform Trust Code, a "trust advisor or trust protector . . . is a fiduciary with respect to each power granted to such trust advisor or trust protector. In exercising any power or refraining from exercising any power, a trust advisor or trust protector shall act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Tenn. Code Ann. § 35-15-1202.

588.     Section 2.1 of the Plan sets forth the powers and responsibilities of AMEC concerning the Plan.

589.     The Plan empowers AMEC "to appoint and remove the Trustee and Administrator from time to time as it deems necessary for the proper administration of the Plan." Plan ¶ 2.1(a).

590.    The power to remove a trustee is one of the specifically enumerated powers that creates a trust protector or trust advisor for purposes of the Tennessee Uniform Trust Code. Tenn. Code Ann. § 35-15-1201(7).

591.    Therefore, AMEC is a trust advisor or trust protector for purposes of the Tennessee Uniform Trust Code.

592.    The Plan requires AMEC to "periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by [AMEC] under the provisions of this Plan or pursuant to procedures established hereunder." Plan ¶ 2.1(c).

593.    This power and obligation of performance review is closely related to the enumerated powers of trustee removal and consent to investments of trust assets as set forth in the Tennessee Uniform Trust Code. Tenn. Code Ann. § 35-15-1201(7) and (12).

594.    Therefore, AMEC is a trust advisor or trust protector for purposes of the Tennessee Uniform Trust Code.

595.    The Plan also requires AMEC to review and approve the annual reports of the Trustee. Plan ¶ 7.6.

596.    The power to review and approve a trustee's trust reports or accountings is one of the specifically enumerated powers that creates a trust protector or trust advisor for purposes of the Tennessee Uniform Trust Code. Tenn. Code Ann. § 35-15-1201(4).

597.    Therefore, AMEC is a trust advisor or trust protector for purposes of the Tennessee Uniform Trust Code.

598.    "In exercising any power or refraining from exercising any power, a trust advisor or trust protector shall act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Tenn. Code Ann. § 35-15-1201(a).

599.    In exercising its trust advisor/trust protector powers and refraining from exercising those powers, AMEC has not acted in accordance with the terms and purposes of the Plan and the interests of the beneficiaries.

600.    AMEC abandoned its fiduciary duty to provide meaningful oversight of Dr. Harris's activities, scrutinize his reports, respond to his self-dealing, embezzlement, and conflicts of interests prior to his voluntary retirement as Executive Director.

601.    This misconduct resulted in Dr. Harris's and Eaton's extraordinarily imprudent and/or fraudulent investments in the Motorskill Entities, Day and Night Solar and undeveloped real estate in Key Marco Island, Florida.

602.    This misconduct also resulted in the steering of Plan assets into low-performing Symetra annuities and Symetra's payment of kickbacks to Dr. Harris.

603.    This misconduct also permitted Dr. Harris to use a series of corporate entities to divert and convert Plan assets through contracts for illusory and/or fraudulent services.

604.    This misconduct also permitted Dr. Harris to conspire with Newport to misrepresent the value of the Motorskill investments and the impact of withdrawals he made from the Fund.

605.    Therefore, AMEC has violated Tenn. Code Ann. § 35-15-1201(a).

606.    Symetra had the power to consent to a trustee's action or inaction relating to the investment of trust assets.

607.    Symetra has conceded the existence of this power. "For example, counsel for Symetra acknowledged that Symetra would not carry out a transaction at Dr. Harris's direction when Symetra had actual notice the transaction was illegal. Whatever the precise contours of this limiting principle may be, the fact that Symetra had discretion to evaluate the lawfulness of a

directive from Dr. Harris and could theoretically refuse the directive if Symetra had reason to know it was improper." (Order on MTD Consolidated Amended Complaint, at 57).

608.    The power to consent to a trustee's action or inaction relating to the investment of trust assets is one of the specifically enumerated powers that creates a trust protector or trust advisor for purposes of the Tennessee Uniform Trust Code. Tenn. Code Ann. § 35-15-1201(8).

609.    Therefore, Symetra is a trust advisor or trust protector for purposes of the Tennessee Uniform Trust Code.

610.    "In exercising any power or refraining from exercising any power, a trust advisor or trust protector shall act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Tenn. Code Ann. § 35-15-1201(a).

611.    This duty can only be overridden "by the terms of a trust, an agreement of the qualified beneficiaries or a court order." Tenn. Code Ann. § 35-15-1202 Sec. Cmt.

612.    There is no trust provision, agreement of the qualified beneficiaries, or court order that relieves Symetra of its fiduciary duties as a trust advisor or trust protector.

613.    Symetra consented to transactions and investments that Symetra knew involved a conflict of interest and self-dealing by Eaton and/or Dr. Harris.

614.    Therefore, Symetra did not act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries when it consented to those transactions.

615.    Symetra failed to ensure that all withdrawals and disbursements from the Fund were made by a plan representative acting within the scope of his authorization.

616.    Symetra failed to establish and/or maintain controls, processes, and procedures in a manner consistent with trust law standards and reasonably calculated to protect the Plan from mismanagement, self-dealing, embezzlement, or other misconduct by Plan fiduciaries.

617.    Dr. Harris's actions as Plan representative were so irregular and the lack of adequate Symetra controls, processes, and procedures to prevent embezzlement, self-dealing, and mismanagement were so obvious that Symetra could not have failed to foresee an unreasonable risk of harm to the beneficiaries of the Plan.

618.    As a consequence, Plaintiffs and Class members suffered injuries in the form of additional loss of Plan assets.

619.    Therefore, Symetra has violated Tenn. Code Ann. § 35-15-1201(a).

620.    Newport performed the function of assembling raw financial statements concerning Plan assets and investments, making judgments about how to translate those statements into reportable asset values, and deciding how to represent those values in statements it distributed to Plan participants.

621.    Such functions would normally be required of a trustee.

622.    In Newport's specific case, it was performing functions that were part of the trustee's broader duty to maintain records, issue a written annual report, and issue Participant Statements based on the current reportable value of Plan assets. *See* Plan ¶ 7.1.

623.    The power to perform a specific duty of function that would normally be required of a trustee is one of the specifically enumerated powers that creates a trust protector or trust advisor for purposes of the Tennessee Uniform Trust Code. Tenn. Code Ann. § 35-15-1201(8).

624.    Therefore, Newport is a trust advisor or trust protector for purposes of the Tennessee Uniform Trust Code.

625.    "In exercising any power or refraining from exercising any power, a trust advisor or trust protector shall act in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Tenn. Code Ann. § 35-15-1201(a).

626.    This duty can only be overridden "by the terms of a trust, an agreement of the qualified beneficiaries or a court order." Tenn. Code Ann. § 35-15-1202 Sec. Cmt.

627.    There is no trust provision, agreement of the qualified beneficiaries, or court order that relieves Newport of its fiduciary duties as a trust advisor or trust protector.

628.    Newport repeatedly made decisions concerning the valuation and reporting of Plan assets that were not in good faith, in accordance with the terms and purposes of the trust, or the interests of the beneficiaries.

629.    Newport made the affirmative decision to report Plan assets in a manner that concealed from Plan participants Dr. Harris's withdrawal of money as an alleged "loan."

630.    Newport made the affirmative decision to increase the reported value of Motorskill investments so as to improve the appearance of the Plan's reported financial performance.

631.    Newport made the affirmative decision to report Motorskill dividends as providing additional value to the Fund despite the fact that Motorskill's own financial statements indicated that such dividends had not actually been earned and were in fact illusory until a liquidity event occurred. Upon information and belief, Newport was never told that such a liquidity event had occurred or that such a liquidity event was imminent.

632.    Additionally, Newport gave Dr. Harris advice on how to defer the recognition of Plan expenses in a manner that allowed the illusory Motorskill dividends to "offset" those expenses and prevent the Plan from reporting a loss.

633.    The purpose of these actions was to inflate the reported value of Plan assets and prevent the Plan from reporting losses that might lead to increased scrutiny and oversight of Dr. Harris's activities.

634.    More generally, Newport failed to require all regular financial statements from all Plan investments, failed to issue financial reports with investment valuations that lacked adequate documentation, and failed to ensure that all investments made by the Plan were made by a Plan representative acting within the scope of his authorization.

635.    Dr. Harris's actions as Plan representative were so irregular and the lack of adequate Plan procedures to prevent embezzlement, self-dealing, and mismanagement were so obvious that Newport could not have failed to foresee an unreasonable risk of harm to the participants and beneficiaries of the Plan.

636.    As a consequence, the Plan suffered injuries in the form of additional loss of Plan assets while Dr. Harris was permitted to operate with impunity.

637.    In doing so, these Defendants failed to make Plan investment decisions based solely on the merits and what was in the interest of Plan participants.  These Defendants therefore failed to discharge their duties solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their duty of loyalty under Tenn. Code Ann. § 35-15-802.

638.    Therefore, Newport has violated Tenn. Code Ann. § 35-15-1201(a).

639.    To the extent that this Court determines that the terms of the Plan and its associated contracts do not provide an adequate remedy against Defendants for the losses suffered by the Plan, this court is empowered to order whatever remedies are necessary in the interests of justice.

640.    The Plan is entitled to damages sufficient to restore the value of the Fund and its distributions to what they would have been had the breach of trust not occurred. See Tenn. Code Ann. § 35-15-1002.

641.    The amount of damages should be, at a minimum, sufficient to restore the value of

the Fund to its June 2021 valuation of $126,800,000.

642.    Plaintiffs are entitled to present proof that the value of the Fund would have been even greater than $126,800,000 if the Defendants had not committed a breach of trust.

643.    Plaintiffs are entitled to all remedies enumerated in Tenn. Code Ann. § 35-15-1001, including a right to an accounting, a right to void certain actions by the trustees, a right to impose a lien or a constructive trust on trust property, and a right to trace trust property for the purpose of recover wrongfully disposed property and/or its proceeds.

644.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

645.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

646.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

### COUNT III
### NEGLIGENCE
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against AMEC, AMEC Department of Retirement Services, AMEC General Board,**
**AMEC Council of Bishops, Bishop Green, Bishop Davis, Newport, and Symetra)**

647.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 545 as if fully set forth herein.

648.    The Defendants named in Count III had a special relationship with the Plan that

gave rise to a duty to exercise due care in the management and oversight of their assets invested in the Fund.

649.    The Defendants knew or should have known that Plan was relying on the Defendants to manage and oversee the investments entrusted to the Plan with reasonable care, and the Plan did reasonably and foreseeably rely on the Defendants to exercise such care.

650.    The Defendants failed to exercise due care and thereby damaged the Plan.

651.    Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, Bishop Davis, Eaton, Newport, and Symetra negligently failed to exercise the degree of prudence, caution, and good business practice required of persons who obtain and manage retirement funds.

652.    Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Dr. Harris, Bishop Green, Bishop Davis, Eaton, Newport, Symetra, and Rodney Brown also negligently failed to perform adequate due diligence and monitoring with respect to the Plan and its investments.

653.    Newport negligently took the position that since the Plan was not technically an ERISA plan, the Plan was not governed by any rules under state and federal law. Newport also negligently performed plan valuations each quarter, by including assets in the valuation that had not been earned nor were payable to the Plan.

654.    AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis failed to exercise the degree of caution required and to perform adequate due diligence when they failed to engage a well-qualified auditor to conduct regular audits of the Plan.

655.    AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC

Council of Bishops, Bishop Green, and Bishop Davis failed to exercise the degree of caution required and to perform adequate due diligence when they relied on facially inadequate auditing reports from a single unqualified auditor for a number of years.

656.    If the Defendants had not been negligent, they would have discovered that the Plan had lost a substantial portion of its assets.

657.    As a proximate and foreseeable result of Defendants' negligence, the Plan has been damaged.

658.    The intentional misconduct of Eaton and Dr. Harris was a foreseeable risk created by the negligence of these Defendants.

659.    Indeed, one of the primary reasons fiduciaries and others with a special relationship to a Retirement Plan must provide oversight of Plan managers and investments is to prevent the managers or other insiders from acting, either individually or as part of a conspiracy, to convert, embezzle, or divert funds from the Plan.

660.    Therefore, the Defendants named in this claim are jointly and severally liable with any intentional tortfeasors named as Defendants in this action.

661.    The Plan is entitled to punitive damages as Defendants were grossly negligent as alleged herein.

662.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

663.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

664.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring

this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on

behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this

lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims

against the other Defendants, only the Church has filed cross-claims.

**COUNT IV**
**CONVERSION**
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against the Estate of Dr. Harris, Sandra Harris, Eaton, Financial Freedom Funds, LLC,**
**Financial Freedom Group, Inc., Trinity Financial Consultants, LLC, Financial**
**Technologies, LLC, and Day & Night Solar)**

665.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 – 545 as if fully set forth herein. Plaintiffs bring this claim against the Estate of Dr.

Harris, Sandra Harris, Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc.,

Trinity Financial, Financial Technologies, and Day & Night Solar.

666.    Dr. Harris, Sandra Harris, Eaton, Financial Freedom Funds, LLC, Financial

Freedom Group, Inc., Financial Technologies, LLC and Day & Night Solar, converted a portion

of the Plan's assets

667.    Dr. Harris converted a portion of the Plan's assets by, *inter alia*,

 a. depositing funds from the Plan into his personal checking account;

 b. demanding excessive administrative fees to be taken from the Plan and retaining

  those fees for his own use;

 c. using funds from the Plan for investment transactions that involved self-

  dealing;

 d. using funds from the Plan for fraudulent service contracts that involved self-

  dealing; and

      e.   abusing his knowledge of the Plan's losses to withdraw a disproportionate share of retirement funds from the Plan before the scope of the losses became widely known.

668.    Sandra Harris converted a portion of the Plan's assets by, *inter alia*,

      a.   Directing or accepting Plan assets to be moved into a joint bank account she shared with Dr. Harris; and

      b.   abusing her knowledge of the Plan's losses to withdraw a disproportionate share of retirement funds from the Plan before the scope of the losses became widely known.

669.    Eaton, Trinity Financial Consultants, LLC, Financial Technologies, LLC and Day & Night Solar converted a portion of the Plan's assets by, *inter alia*,

      a.   Entering into a loan from the AMEC Department of Retirement Services and subsequently settling the loan on unreasonably favorable terms;

      b.   Receiving salary and kickbacks from the Motorskill Entities in exchange for steering Plan assets to the Motorskill Entities;

      c.   Receiving funds from the Plan for fraudulent service contracts;

      d.   Entering into a loan from the Plan on unreasonably favorable terms for Day & Night Solar's benefit; and

      e.   Taking investments in Day & Night Solar of Plan assets directly from the Plan and indirectly through Motorskill without giving fair value in exchange to the Plan.

670.    Financial Freedom Funds, LLC converted a portion of the Plan's assets by, *inter alia*,

    a.   using funds from the Plan for investment transactions that enriched Eaton and Dr. Harris at the expense of the Plan; and

    b.   using funds from the Plan for fraudulent service contracts that enriched Eaton and Dr. Harris at the expense of the Plan.

671.    Financial Freedom Group, Inc. converted a portion of the Plan's assets by, *inter alia*, receiving funds from the Plan for fraudulent service contracts.

672.    The Plan has been damaged as a proximate and direct result of Defendants' conversion of Plaintiffs and other Class members' respective contributions to the Fund. The Plan has been deprived of the reasonable rates of return that it otherwise would have earned.

673.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

674.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

675.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

**<u>COUNT V</u>**
**<u>FRAUDULENT CONCEALMENT</u>**
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against AMEC, AMEC Department of Retirement Services, AMEC General Board,**
**AMEC Council of Bishops, Bishop Green, Bishop Davis, Eaton, Estate of Dr. Harris,**
**Symetra, and Newport)**

676.    Plaintiffs reallege and incorporate by reference the allegations contained in

**Page 93 of 128**

paragraphs 1 - 545 as if fully set forth herein.

677.    Defendants AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Green, and Bishop Davis ("AMEC Defendants") concealed or suppressed material facts Plaintiffs and Class members regarding the management of the Fund and lack of oversight of Dr. Harris, his investments, and the balance of the Fund.

678.    These material facts were concealed or suppressed by the AMEC Defendants with the intent of deceiving Plaintiffs and Class Members about the quality of their stewardship of Plan assets and their exercise of fiduciary duties.

679.    AMEC owed a duty to the Plan as a named fiduciary of the Plan and as an entity that exercised discretionary authority or control respecting management of the Plan.

680.    At all relevant times, AMEC acted through the AMEC General Board and the AMEC Council of Bishops when exercising (or failing to exercise) that discretionary authority or control.

681.    Under the terms of the Plan, AMEC (acting through the AMEC General Board and the AMEC Council of Bishops) was charged with receiving and reviewing annual reports from Dr. Harris about the Fund. The terms of the plan specifically charged AMEC with approving or disapproving such reports.

682.    AMEC, AMEC General Board, and AMEC Council of Bishops concealed from Plaintiffs and Class Members the fact that AMEC was simply "rubber stamping" Dr. Harris's reports without any meaningful review of Dr. Harris's reported asset valuations, disbursements, or contractual relationships.

683.    This fact was not apparent to Plaintiffs and Class members through common observation or ordinary diligence.

684. This fact was material because Plaintiffs and Class Members relied on the idea that AMEC, AMEC General Board, and AMEC Council of Bishops were faithfully carrying out their assigned duties relating to the Plan.

685. AMEC, AMEC General Board, and AMEC Council of Bishops intended to deceive Plaintiffs and Class Members about their lack of diligence and oversight relating to the Plan.

686. If Plaintiffs and Class Members had known that AMEC, AMEC General Board, and AMEC Council of Bishops were abdicating their responsibilities, Plaintiffs and Class Members would have demanded meaningful oversight and/or a change in AMEC leadership.

687. Such demands could have significantly reduced the amount of losses ultimately suffered by the Plan.

688. AMEC Department of Retirement Services owed a duty to Plaintiffs and Class Members as a named fiduciary of the Plan and as an entity that exercised discretionary authority or control respecting management of the Plan.

689. From 2012 to 2016, AMEC Department of Retirement Services acted through its chairman, Bishop Davis.

690. From 2016 to 2021, AMEC Department of Retirement Services acted through its chairman, Bishop Green.

691. AMEC Department of Retirement Services (acting through Bishop Davis and Bishop Green) was the Administrator of the Plan.

692. Per Article V of the Plan, the Administrator was charged with overseeing the valuation of Plan Assets.

693. Per Section 2.3 of the Plan, the Administrator was charged with, *inter alia*,

    a. Computing, certifying, and directing the Trustee with respect to the amount of

benefits to which Plan Participants were entitled;

b. Authorizing and directing the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust;

c. Maintaining all necessary records for the administration of the Plan; and

d. Making and publishing rules for regulation of the Plan.

694. Per Section 2.5 of the Plan, the Administrator was charged with appointing or consenting to the appointment of counsel, specialists, advisers, and agents of the Plan.

695. AMEC Department of Retirement Services, Bishop Davis, and Bishop Green concealed from Plaintiffs and Class Members the fact that they were not providing any meaningful oversight of the Trustee's valuation of Plan Assets.

696. AMEC Department of Retirement Services, Bishop Davis, and Bishop Green concealed from Plaintiffs and Class Members the facts that they were not providing any meaningful oversight of the Trustee's recordkeeping, the Trustee's appointment of agents, the Trustee's disbursements from the Trust, or the Trustee's computation of the amount of benefits to which Plan Participants were entitled (which was dependent on the Trustee's valuation of Plan Assets).

697. AMEC Department of Retirement Services, Bishop Davis, and Bishop Green intended to deceive Plaintiffs and Class Members about the existence of these facts.

698. As fiduciaries of the Plan, AMEC Department of Retirement Services, Bishop Davis, and Bishop Green had a duty to disclose these facts to Plaintiffs and Class Members.

699. None of these material facts were apparent to Plaintiffs and Class members through common observation or ordinary diligence.

700. These facts were material because if Plaintiffs and Class Members had known that

AMEC Department of Retirement Services, Bishop Davis, and Bishop Green were abdicating their responsibilities, Plaintiffs and Class Members would have demanded meaningful oversight and/or a change in AMEC leadership.

701.    Such demands could have significantly reduced the amount of losses ultimately suffered by Plaintiffs and Class Members.

702.    Eaton concealed or suppressed material facts from Plaintiffs and Class members including, *inter alia*,

a.    The high-risk and speculative investments made with Plan assets;

b.    The fact that the Plan was earning far below the market rate of return and growth for a pension plan;

c.    The fact that Eaton received commissions from Symetra in exchange for his decision to select Symetra as the Plan's primary investment vendor for fixed-income investments.

d.    The fact that Dr. Harris was using Plan assets to pay a network of corporate entities for fraudulent and/or illusory services;

e.    The fact that the corporate entities contracting for these "services" were established, owned, and/or operated by Eaton and Dr. Harris;

f.    The fact that Dr. Harris and Eaton were receiving kickbacks from the Motorskill Entities in exchange for investing Plan assets in those entities;

g.    The fact that Eaton was a paid employee of the Motorskill Entities during the period Plan assets were being invested in the Motorskill Entities;

h.    The fact that Eaton was diverting Plan assets to Day & Night Solar for his benefit; and

    i.   The fact that Dr. Harris and Eaton repeatedly rejected opportunities to obtain better returns from fixed-income investments than what Symetra was providing the Plan;

703.    As a fiduciary of the Plan, Eaton had a duty to disclose all of the above facts.

704.    None of these material facts were apparent to Plaintiffs and Class members through common observation or ordinary diligence.

705.    These material facts were concealed or suppressed with the intent of deceiving Plaintiffs and Class Members about the true state of the Fund, Eaton's violation of his fiduciary duties, and Eaton's corrupt agreements with other parties to enrich himself at the expense of the Plan and the Fund.

706.    These facts were material because if Plaintiffs and Class Members had known of Eaton's conflicts of interest, self-dealing, embezzlement, and conspiracy, Plaintiffs and Class Members would have demanded Eaton's removal and significant changes to AMEC's leadership and oversight process.

707.    Such demands could have significantly reduced the amount of losses ultimately suffered by Plaintiffs and Class Members.

708.    Dr. Harris concealed or suppressed material facts from Plaintiffs and Class members including, *inter alia*,

    a.   The high-risk and speculative investments made with Plan assets;

    b.   The fact that the Plan was earning far below the market rate of return and growth for a pension plan;

    c.   The fact that Dr. Harris was receiving kickbacks in the form of "administrative fees" from Symetra that exceeded the express limits established by AMEC;

d.  The fact that Dr. Harris was using Plan assets to pay a network of corporate entities for fraudulent and/or illusory services;

e.  The fact that the corporate entities contracting for these "services" were established, owned, and/or operated by Eaton and Dr. Harris;

f.  The fact that Dr. Harris and Eaton were receiving kickbacks from the Motorskill Entities in exchange for investing Plan assets in those entities;

g.  The fact that Dr. Harris and Eaton repeatedly rejected opportunities to obtain better returns from fixed-income investments than what Symetra was providing the Plan;

709.  As a fiduciary of the Plan, Dr. Harris had a duty to disclose all of the above facts.

710.  None of these material facts were apparent to Plaintiffs and Class members through common observation or ordinary diligence.

711.  These material facts were concealed or suppressed with the intent of deceiving Plaintiffs and Class Members about the true state of the Fund, Dr. Harris's violation of his fiduciary duties, and Dr. Harris's corrupt agreements with other parties to enrich himself at the expense of the Plan and the Fund.

712.  These facts were material because if Plaintiffs and Class Members had known of Dr. Harris's conflicts of interest, self-dealing, embezzlement, and conspiracy, Plaintiffs and Class Members would have demanded Dr. Harris's removal and significant changes to AMEC's leadership and oversight process.

713.  Such demands could have significantly reduced the amount of losses ultimately suffered by Plaintiffs and Class Members.

714.  Newport concealed or suppressed material facts from Plaintiffs and Class members

including, *inter alia*,

  a.  The fact that investments in the Motorskill Entities were being arbitrarily revalued from $5 per unit to $7 per unit;

  b.  The fact that dividends from the Motorskill Entities had not actually been earned and were based on speculative notions of an undefined future "liquidity event";

  c.  The fact that the Motorskill Entities stopped providing financial statements altogether in 2019; and

  d.  The fact that Newport was advising Dr. Harris to defer certain Plan expenses to align with the illusory Motorskill dividends and avoid reporting losses in quarterly statements.

715.    As a fiduciary of the Plan, Newport had a duty to disclose all of the above facts.

716.    None of these material facts were apparent to Plaintiffs and Class members through common observation or ordinary diligence.

717.    These material facts were concealed or suppressed with the intent of deceiving Plaintiffs and Class Members about the true state of the Fund and Dr. Harris's violation of his fiduciary duties.

718.    These facts were material because if Plaintiffs and Class Members had known that Newport was advising Dr. Harris about how to report Plan expenses in a manner that favored Dr. Harris and intentionally valuing Plan assets in a manner that did not fairly reflect the speculative and/or imprudent nature of the Plan's investments, Plaintiffs and Class Members would have questioned the true value of the Plan's assets. Plaintiffs and Class Members would have also demanded significant changes to AMEC's oversight of the Fund, including the possible removal

of Dr. Harris and/or Newport from their positions of trust and authority.

719.   Such demands could have significantly reduced the amount of losses ultimately suffered by Plaintiffs and Class Members.

720.   Symetra concealed or suppressed material facts from Plaintiffs and Class members including, *inter alia*,

> a.   The fact that investments Symetra annuities were being liquidated with the funds transferred to entities owned and/or controlled by Eaton and/or Dr. Harris;
>
> b.   The fact that Eaton was receiving hundreds of thousands of dollars in commissions from Symetra;
>
> c.   The fact that it was writing checks to Dr. Harris for administrative fees totaling almost $1,000,000 per year and making the checks out to "Dr. Jerome V. Harris, Trustee" instead of to the Department; and
>
> d.   The fact that Symetra allowed Dr. Harris to withdraw "administrative fees" in excess of what his authority permitted.

721.   As a fiduciary of the Plan, Symetra had a duty to disclose all of the above facts.

722.   None of these material facts were apparent to Plaintiffs and Class members through common observation or ordinary diligence.

723.   These material facts were concealed or suppressed with the intent of deceiving Plaintiffs and Class Members about the true state of the Fund and Dr. Harris's violation of his fiduciary duties.

724.   These facts were material because if Plaintiffs and Class Members had known that Symetra was transferring funds to Dr. Harris and entities owned/controlled by him in a manner

that permitted his self dealing and fraudulent conduct, Plaintiffs and Class Members would have questioned the true value of the Plan's assets. Plaintiffs and Class Members would have also demanded significant changes to AMEC's oversight of the Fund, including the possible removal of Dr. Harris and/or Newport and/or Symetra from their positions of trust and authority.

725.    Such demands could have significantly reduced the amount of losses ultimately suffered by Plaintiffs and Class Members.

726.    As a result of Defendants' actions, Plaintiffs and other Class members have been damaged.

727.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

728.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

729.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against Estate of Dr. Harris and Newport)**

730.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 545 as if fully set forth herein.

731.    Dr. Harris either knowingly, without belief in their truth, or recklessly made false

**Page 102 of 128**

representations about the value of Plan assets, the overall balance of the Fund, and the Fund's rate of return.

732.    Dr. Harris knew that dividends had not actually been earned on the Motorskill subscriptions but authorized the issuance of statements including those dividends in their valuation of the Plan's assets.

733.    Dr. Harris knowingly, without belief in their truth, or recklessly made false representations that the Motorskill subscriptions were valued at $7 per unit.

734.    Dr. Harris knowingly, without belief in their truth, or recklessly made false representations that the Motorskill Entities remained operating and solvent after 2019.

735.    Dr. Harris knowingly, without belief in their truth, or recklessly made false representations about the value of the Key Marco real estate investments.

736.    Dr. Harris made these representations both indirectly (through Newport) and directly to Plaintiffs and Class Members.

737.    All of these representations were false at the time they were communicated to Plaintiffs and other Class members.

738.    Plaintiffs and other Class Members reasonably relied on the misrepresentations when evaluating the performance of the Plan, Dr. Harris, and the AMEC Defendants.

739.    The overall value of the Plan's assets and value of the Plan's Motorskill investments were material facts relating to the performance and management of the Plan.

740.    Plaintiffs and other Class members reasonably relied on Dr. Harris's misrepresentations when evaluating the performance of the Plan, Dr. Harris, and the AMEC Defendants.

741.    Plaintiffs and other Class members suffered damage as a result of Dr. Harris's

misrepresentations.

742.    Newport either knowingly, without belief in their truth, or recklessly, made false representations about the overall value of Plan assets and the value of the Plan investments in the Motorskill Entities.

743.    Newport knew that dividends had not actually been earned on the Motorskill subscriptions but reported the value of the investments as if they had been earned.

744.    Newport knew that the $7 per unit valuation of the Motorskill subscriptions was not based on substantial financial documentation.

745.    Newport published valuations of the Motorskill subscriptions either recklessly or without belief in their truth due to Newport's recognition that that there was no substantial financial documentation for the $7 valuation and thus an unreasonable risk that the valuation was false.

746.    The overall value of the Plan's assets and value of the Plan's Motorskill investments were material facts relating to the performance and management of the Plan.

747.    Plaintiffs and other Class members reasonably relied on Newport's misrepresentations about the value of the Plan's assets and the Plan's Motorskill investments when evaluating the performance of the Plan, Dr. Harris, and the AMEC Defendants.

748.    These false representations were in fact subsequently conveyed to Plaintiffs and Class Members as part of AMEC's annual Plan statements and the reported Plan values sent to Plan Participants.

749.    Those false representations were also conveyed to Plaintiffs and Class Members as part of the quarterly statements they received of their vested balances in the Fund, which during Dr. Harris's tenure were typically sent to the Plaintiffs and Class Members by Newport.

750.    The value of the Plan's Motorskill investments was a material fact relating to the

performance and management of the Plan.

751.    Plaintiffs and other Class members reasonably relied on the misrepresentations about the value of the Motorskill Investments when evaluating the performance of the Plan, Dr. Harris, and the AMEC Defendants.

752.    Plaintiffs and other Class members suffered damage as a result of the misrepresentations about the value of the Motorskill Investments.

753.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

754.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

755.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

<u>**COUNT VII**</u>
<u>**BREACH OF CONTRACT**</u>
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against AMEC)**

756.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 545 as if fully set forth herein.

757.    The Doctrine and Discipline of the AMEC ("Doctrine & Discipline") was first established in the Church's infancy in the 1800s and is amended every four years at the Annual Conference and republished. It is, according to AMEC's corporate representative's testimony, the

controlling document with respect to the Plan.

758.    The Doctrine & Discipline contains the positive law of the Church, including AMEC's articles of incorporation.

759.    The Doctrine & Discipline at all relevant times has contained a Minister Bill of Rights that states that ""[i]t shall be the **basic right** of itinerant ministers of the African Methodist Episcopal Church to: . . . Retirement Benefits. In this regard, the Doctrine & Discipline states that "[a] retired pastor of the AME Church is entitled to the benefits of his or her annuity and benefits of a qualified retirement program for pastors of the AME Church, as enacted by the 1996 General Conference." Sec. II, B. 12 (emphasis added).

760.    The Doctrine & Discipline makes the Department of Retirement Services, an unincorporated department within the connectional Church, responsible for directing the Ministerial Annuity Plan. Part XIII, sec. 1, D. 2 (a)(1)

761.    The Doctrine & Discipline additionally states that "[t]here is hereby established annuity coverage for all salaried personnel of the AME Church." *Id.*

762.    The Commission on Retirement Services of the General Board is appointed to be the trust committee for the annuity coverage under the Doctrine & Discipline. *Id.* at 2 (a)(2).

763.    The Doctrine & Discipline further states that "[a]ll Bishops, general officers, college presidents/deans of theological seminaries, itinerant elders and all other ordained persons receiving an appointment to a pastoral charge, must enroll and participate in the Annuity Plan . . . [and] will be enrolled in the Annuity Plan regardless of age . . . [and] may elect to retire at age sixty-five (65) or thereafter. *Id*. at 2(a)(5).

764.    The Doctrine & Discipline further provides that "[a]ll eligible and enrolled participants in the AME Church Ministerial Retirement Plan, upon official retirement, or

separation from active service, shall be eligible to receive the total amount of funds vested in their personal annuity account, plus vested interest, irrespective of their years of active service." *Id*. at 2(a)(6).

765.    The Doctrine & Discipline further provides that the "bishop of an episcopal district shall use the same diligence and have the same authority and obligation in the collection of annuity coverage premiums as he or she has in the collection of the General Budget Funds. . . .  The Church or other sources paying the salary shall pay the total twelve percent (12%) required by plan." *Id*. at 2(a)(7).

766.    The Doctrine & Discipline further provides, as relevant here, that the "Retirement Plan for Pastors & Presiding Elders, . . . shall be administered by the Department of Retirement Services, under the direction of its Executive Director. . . . [and] shall be consistent with and comply with all requirements of the Employee Retirement Income Security Act (ERISA) as it presently exists and as it may be amended from time to time." *Id*. at 2(a)(11)(d).

767.    AMEC has also repeated these promises to this day in the current Doctrine and Discipline issued in 2021.

768.    AMEC has also repeated these promises in summary plan descriptions found on the AMEC website and in the only Plan document received by the Plaintiffs to date.

769.    The 2006 Plan Document is sixty-eight pages long. On page sixty-two, under a section labeled "Miscellaneous," the Document includes the following disclaimer: "This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any

Participant or Employee at any time regardless of the effect which such discharge shall have upon the Employee as a Participant of this Plan."

770.    This disclaimer appears only once in the Plan Document.

771.    This disclaimer is not bolded, rendered in a larger font, or set off from the main text of the Plan Document in any way.

772.    Plaintiffs were not required to sign an acknowledgement that they had read and understood either the Plan Document or the single disclaimer on page sixty-two of the document.

773.    AMEC did not draft the Plan Document itself but instead outsourced the drafting of the Plan Document to Newport.

774.    Newport used an existing template document to create the Plan Document for AMEC.

775.    AMEC did not outsource the creation of its Doctrine & Discipline to a third party or use a pre-existing template to create the Doctrine & Discipline.

776.    The Doctrine & Discipline itself contains no disclaimer as to its effect.

777.    To the contrary, the Doctrine & Discipline makes affirmative contractual promises to Plaintiffs and Class Members, including promises of contributions in accordance with the Doctrine & Discipline, and a pension plan and retirement benefits managed in compliance with ERISA in exchange for their services as pastors or as non-ministerial employees.

778.    In context, to the extent that the Doctrine & Discipline conflicts with a single disclaimer contained in a template Plan Document that AMEC outsourced to a third party, the Doctrine & Discipline should prevail as a more reliable indication of the intentions of both AMEC and the Class members.

779.    Notably, the Doctrine & Discipline does not make any affirmative promises about

a right to be retained in the service of AMEC.

780. Therefore, there is a sharp contrast between the Plan's disclaimer of a contract for continued employment with AMEC (uncontradicted by the Doctrine & Discipline and specifically enumerated) and the Plan's disclaimer of any contract for Plan contributions, management, and disbursements (contradicted by the Doctrine & Discipline and not specifically enumerated).

781. The disclaimer on page sixty-two of the Plan is insufficient to prevent the formation of a contract with Plan Participants concerning Plan contributions, management, and disbursements through the Doctrine & Discipline, which contained explicit promises with respect to the Plan and contained no such disclaimer.

782. Accordingly, the Doctrine & Discipline constitutes an enforceable contract and the promises concerning the Plan in the Doctrine & Discipline and in the template Plan Document to the extent consistent with the Doctrine & Discipline constitute binding contractual promises to the ministers and employees who participated in the Plan or who should have been enrolled in the Plan.

783. The written promises made by AMEC were clearly communicated to Plaintiffs and Class members through the quadrennial Doctrine and Discipline text that follows each General Conference.

784. Plaintiffs and the other Class members' continued work for AMEC constituted consideration for the promises contained in the Doctrine & Discipline.

785. Accordingly, the Doctrine & Discipline constitutes an enforceable contract and the promises in the Doctrine & Discipline with regard to the Plan constitute binding contractual promises to the ministers and employees who participated in the Plan or who should have been enrolled in the Plan.

786.    By continuing to work for the Church, Plaintiffs and Class members performed their obligations under the contracts and satisfied the conditions required to trigger AMEC's duty to provide retirement benefits pursuant to the requirements applicable to an ERISA-compliant Plan. This duty was triggered even though AMEC did not fulfill the technical requirements for a formal ERISA election.

787.    These ERISA requirements include, *inter alia*, funding all participant accounts pursuant to the Plan's terms, restoring all accounts to the amounts listed on Plan participants' last benefits statements, making the plan whole for the losses caused by the imprudent and/or disloyal mismanagement of the Plan by the AMEC fiduciaries charged with managing, administering and overseeing the Plan, its investments and the other fiduciaries who administer and manage the Plan and its assets, and paying benefits to retirees upon request.

788.    AMEC breached its contractual obligations under the Plan and Doctrine & Discipline by, *inter alia*, (1) allowing a single fiduciary, Dr. Harris, to make imprudent, risky, self-dealing and prohibited investments with Plan assets; and (2) failing to pay Plaintiffs and other Class Members retirement benefits to which they are entitled when requested upon their retirements to do so.

789.    AMEC further breached the implied covenant of good faith and fair dealing, as AMEC failed to exercise good faith in the performance of its obligations to comply with ERISA.

790.    These failures resulted in losses of tens of millions of dollars in retirement savings for the Church's clergy and other eligible participants, for which AMEC is liable as damages to Plaintiffs and the Class.

791.    Plaintiffs and the Class are additionally entitled to specific performance of the obligations contained in the Plan documents, including: (1) AMEC's obligation to operate the Plan

in accordance with ERISA; (2) AMEC's obligation to promptly pay retirement benefits to retirees upon request; and (3) AMEC's implied obligation to act in good faith in the performance of its contractual obligations.

792.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

793.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

794.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

<u>COUNT VIII</u>
<u>CIVIL CONSPIRACY</u>
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against Estate of Dr. Harris, Sandra Harris, Symetra, Newport, Eaton, Financial Freedom Funds, LLC, Day & Night Solar, Trinity Financial, Financial Freedom Group, Inc., Financial Technologies, LLC, and the Motorskill Entities)**

795.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-545 as if fully set forth herein.

796.    Dr. Harris, Sandra Harris, Symetra, Newport, Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Day & Night Solar, Financial Technologies, LLC, Trinity Financial, and the Motorskill Entities conspired together in a scheme that was intended to accomplish an unlawful purpose by concerted action.

797.    Dr. Harris and his co-conspirators shared a common plan or design to enrich

themselves at the expense of the Plan.

798.    Dr. Harris and each of his co-conspirators was aware of a common plan or design and the agreed to participate in a common plan or design.

799.    Dr. Harris and each of his co-conspirators committed overt acts in furtherance of the conspiracy.

800.    Dr. Harris and each of his co-conspirators provided substantial assistance to the conspiracy.

801.    Dr. Harris's overt acts in furtherance of the conspiracy included, *inter alia*,

   a.   Placing and maintain the Fund's assets in low-rate annuities offered by a provider (Symetra) that was willing to pay him kickbacks disguised as administration fees;

   b.   Demanding and receiving an increase in the kickbacks paid to him by Symetra for keeping Plan funds invested with Symetra;

   c.   Diverting Fund assets to a series of corporate entities he established, controlled, and/or directed for the purpose of skimming Fund assets, thereby enriching himself, Sandra Harris, and Eaton;

   d.   Authorizing multiple prohibited transactions in the form of contracts and loans to entities owned or controlled by himself and/or Eaton;

   e.   Diverting Fund assets to the Motorskill Entities in exchange for kickbacks;

   f.   Covertly using the resources of Newport and Symetra to secure his re-election as Executive Director of AMEC Retirement Services and Plan Administrator;

   g.   Directing Newport to manipulate Plan financial statements in a manner that prevented the Plan from reporting losses; and

h.  Abusing his knowledge of the Plan's lost assets to ensure that his assets were withdrawn from the Plan before the Plan's losses became public knowledge.

802.  Sandra Harris's overt acts in furtherance of the conspiracy included, *inter alia*,

a.  Serving as a signatory on the bank accounts of Trinity Financial Consultants and otherwise working to operate that entity as it skimmed money from the Plan through a series of contracts for fictitious "management services"

b.  Abusing her knowledge of the Plan's lost assets to ensure that her retirement assets were withdrawn from the Plan before the Plan's losses became public knowledge.

803.  Symetra's overt acts in furtherance of the conspiracy included, *inter alia*,

a.  Paying kickbacks to Dr. Harris to induce him to keep Fund assets in Symetra annuities;

b.  Transferring Plan assets to entities owned and/or controlled by Dr. Harris; and

c.  Covertly assisting Dr. Harris's 2008 re-election campaign for Executive Director of the AMEC Department of Retirement Services so that Symetra's corrupt bargain with Dr. Harris could continue.

804.  Newport's overt acts in furtherance of the conspiracy included, *inter alia*,

a.  Reporting fictitious dividends from Motorskill Entities despite receiving financial statements showing that such dividends had not actually been earned as income;

b.  Reporting investments in Motorskill Entities at full value despite the failure of Motorskill Entities to issue any financial statements after 2019;

c.  Increasing the reported value of investments in Motorskill Entities from $5 a

unit to $7 so as to improve the appearance of the Plan's financial returns;

    d.  Advising Dr. Harris about how to defer reporting of Plan expenses until those expenses could be offset by reporting of fictitious dividends from the Motorskill Entities.

805.    Eaton's overt acts in furtherance of the conspiracy included, *inter alia*,

    a.  Steering Fund assets into low-performing Symetra annuities in exchange for large commissions;

    b.  Advising Dr. Harris not to move Fund assets into fixed income investments that would yield better returns for the Fund;

    c.  Steering Fund assets into Motorskill Entities that paid him as an executive;

    d.  Steering Fund assets into Motorskill Entities in exchange for kickbacks; and

    e.  Using entities he owned and/or controlled (Financial Freedom Group, Financial Technologies, LLC, and Day and Night Solar) to divert and convert Fund assets through favorable loans and contracts for fictitious management services and conflicted advisory services.

806.    Financial Freedom Funds' overt acts in furtherance of the conspiracy included, *inter alia*,

    a.  Serving as a vehicle for diverted Fund assets that were later rerouted into other entities owned and/or controlled by the co-conspirators (AMEC Financial Services, LLC, Financial Freedom Group, Trinity Financial Consultants, and the Motorskill Entities).

807.    Financial Freedom Group's overt acts in furtherance of the conspiracy included, *inter alia*,

a. Entering into a series of contracts for fraudulent and/or illusory services that were paid for with diverted Fund assets.

808. Financial Technologies, LLC's overt acts in furtherance of the conspiracy included, *inter alia*,

a. Entering into a marketing alliance contract with AMEC Financial Services, LLC that funneled Plan assets to Financial Technologies and Eaton;

b. Serving as the exclusive broker of record for the Plan and enabling Eaton to receive commissions from Symetra for steering Plan assets to Symetra; and

c. Receiving a loan from AMEC Financial Services, LLC and then settling that loan on unreasonably favorable terms.

809. Day & Night Solar's over acts in furtherance of the conspiracy included, *inter alia*,

a. Accepting loan funds negotiated by co-conspirators Eaton and Dr. Harris on terms that were not favorable to the Plan; and

b. Serving as a vehicle for diverted Fund assets that ultimately unjustly enriched co-conspirator Eaton;

810. Trinity Financial Consultants, LLC's overt acts in furtherance of the conspiracy included, *inter alia*,

a. entering into a series of contracts for fraudulent and/or illusory services that were paid for with diverted Plan assets; and

b. receiving commissions from the Motorskill Entities.

811. The Motorskill Entities' overt acts in furtherance of the conspiracy included, *inter alia*,

a. Paying kickbacks to Dr. Harris and Eaton for steering Fund assets into the

entities; and

b.   Providing false and inflated investment values to Dr. Harris and Newport for

compilation, approval, and inclusion in published reports

812.    The Plan suffered damages as a result of the conspiracy.

813.    Because Defendants acted intentionally, fraudulently, or recklessly in the course of

their conspiracy, the Plan entitled to punitive damages.

814.    By reason of the foregoing, the Defendants are jointly and severally liable to the

Plan under Tenn. Code Ann. § 29-11-107(b)(1).

815.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring

this claim on the Plan's behalf.

816.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan

committed wrong against the Plan. Further, the remaining Defendants under this cause of action

harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

817.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring

this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on

behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this

lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims

against the other Defendants, only the Church has filed cross-claims.

## COUNT IX
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)**
**(Against  Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group,
Inc, Financial Technologies, LLC, Day & Night Solar, Trinity Financial Consultants, LLC,
the Motorskill Entities, and Sandra Harris)**

818.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1-545 as if fully set forth herein.

819.    Dr. Harris had a fiduciary duty to Plaintiffs, other Class Members, and the Plan because he acted as the Trustee and Executive Director of the Plan and he exercised substantial discretion and control over Plaintiffs' retirement funds and the Plan's assets.

820.    Eaton had a fiduciary duty to the Plan as a paid investment advisor and the registered broker of the Plan and because he exercised substantial discretion and control over Plaintiffs' retirement funds and the Plan's assets.

821.    Dr. Harris and Eaton breached their fiduciary duties to the Plan.

822.    Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, Day and Night Solar, Trinity Financial Consultants, LLC, the Motorskill Entities, and Sandra Harris knew that Dr. Harris and Eaton had a fiduciary duty to the Plan.

823.    Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, Day and Night Solar, Trinity Financial Consultants, LLC, the Motorskill Entities, and Sandra Harris knew that the conduct of Dr. Harris and Eaton constituted a breach of fiduciary duty to the Plan.

824.    These Defendants knew that, among other things:

a.    Dr. Harris and Eaton were engaging in a long-term pattern of financial mismanagement, embezzlement, fraud, and misrepresentations concerning the Plan,

b.    Dr. Harris and Eaton were engaging in a pattern of self-dealing with Plan assets,

c.    Dr. Harris and Eaton were making high-risk and speculative investments with Plan assets, and

d.    Dr. Harris and Defendant Eaton were allowing the Plan to earn returns that were

far below the average rate of return for pension plans.

825.    Newport, Symetra, Financial Freedom Funds, LLC, Financial Freedom Group, Inc.,

Financial Technologies, LLC, Day and Night Solar, Trinity Financial Consultants, LLC, the

Motorskill Entities, and Sandra Harris provided substantial assistance or encouragement to Dr.

Harris and Eaton in their breaches of fiduciary duty to the Plan.

826.    Newport substantially assisted or encouraged Dr. Harris and Eaton's breaches of

fiduciary duty by, *inter alia*,

a.   Reporting fictitious dividends from Motorskill Entities despite receiving

financial statements showing that such dividends had not actually been earned

as income;

b.   Reporting investments in Motorskill Entities at full value despite the failure of

Motorskill Entities to issue any financial statements after 2019;

c.   Increasing the reported value of investments in Motorskill Entities from $5 a

unit to $7 so as to improve the appearance of the Plan's financial returns;

d.   Advising Dr. Harris about how to defer reporting of Plan expenses until those

expenses could be offset by reporting of fictitious dividends from the Motorskill

Entities.

e.   Participating in Dr. Harris and Eaton's pattern of self-dealing by identifying the

fact that Dr. Harris and Eaton were intending to transfer Plan assets to entities

solely controlled by themselves and failing to prevent the transactions;

f.   Giving Dr. Harris unreasonable legal advice on the interpretation of AMEC

Doctrine and Discipline; and

g.   Advising Dr. Harris on potential Plan investments in additional high risk and

speculative investments.

827. Symetra substantially assisted or encouraged Dr. Harris and Defendant Eaton's breaches of fiduciary duty by, *inter alia*,

    a. Correctly identifying the fact that Dr. Harris and Eaton were intending to transfer Plan assets to entities solely controlled by themselves and making the transfers despite their knowledge that Dr. Harris and Eaton were making prohibited transactions;

    b. Paying kickbacks to Dr. Harris to induce him to keep Fund assets in Symetra annuities; and

    c. Assisting Dr. Harris in his 2008 re-election campaign to the position of Executive Director of the Department of Retirement Services.

828. Financial Freedom Funds, LLC substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by serving as a vehicle for diverted Plan assets that were later rerouted into other entities owned and/or controlled by the Dr. Harris and Eaton (AMEC Financial Services, LLC, Financial Freedom Group, Inc., and Trinity Financial Consultants, LLC)

829. Financial Freedom Group, Inc. substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by entering into a series of contracts for fraudulent and/or illusory services that were paid for with diverted Plan assets.

830. Day & Night Solar substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by serving as a vehicle for diverted Plan assets in ways that unjustly enriched Defendant Eaton.

831. Financial Technologies, LLC, substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by, *inter alia*,

    a.  Entering into a marketing alliance contract with AMEC Financial Services, LLC that funneled Plan assets to Financial Technologies and Eaton; and

    b.  Serving as the exclusive broker of record for the Plan and enabling Eaton to receive commissions from Symetra for steering Plan assets to Symetra; and

    c.  Receiving a loan from AMEC Financial Services, LLC and then settling that loan on unreasonably favorable terms.

832.    Trinity Financial Consultants, LLC, substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by entering into a series of contracts for fraudulent and/or illusory services that were paid for with diverted Plan assets and receiving commissions from the Motorskill Entities.

833.    The Motorskill Entities substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by, *inter alia*,

    a.  Paying kickbacks to Dr. Harris and Eaton for steering Fund assets into the entities; and

    b.  Providing false and inflated investment values to Dr. Harris and Newport for compilation, approval, and inclusion in published reports.

834.    Sandra Harris substantially assisted or encouraged Dr. Harris and Eaton's breaches of fiduciary duty by serving as a signatory on the bank accounts of Trinity Financial Consultants and otherwise working to operate that entity as it skimmed money from the Plan through a series of contracts for fictitious "management services"

835.    Dr. Harris and Eaton's breaches of their fiduciary duties and the other Defendants' substantial assistance or encouragement in these breaches have directly and proximately caused substantial harm to the Plan.

836.    The Plan is entitled to recover from the Defendants the amount of damages proximately caused by their conduct.

837.    The Defendants' substantial assistance to these breaches of fiduciary duties was willful, wanton, and outrageous. The Plan is entitled to an award of punitive damages against the Defendants to deter such conduct in the future.

838.    Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

839.    Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

840.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

### COUNT X
### PROFESSIONAL NEGLIGENCE
### (Individually, Derivatively on Behalf of the Plan, and on Behalf of the Class)
**(Against  Newport and Rodney Brown)**

841.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-545 as if fully set forth herein.

842.    At all material times, Newport had two licensed CPAs, David Fiszer and Mark Yahoudy, assigned to perform work regarding the Plan.

843.    The scope of Newport's work including accounting functions, including quarterly valuations of the Plan.

844.    That work was performed quarterly by David Fiszer at all relevant times and occasionally Mark Yahoudy oversaw and/or provided input on Newport quarterly valuations and other accounting work that was performed by David Fiszer.

845.    At all material times, Newport owed the Plan and Plaintiffs a duty to exercise reasonable care in performing valuations of the Plan's assets in order to accurately reflect the Plan's valuation and each Plan Participant's respective vested benefits in the Plan.

846.    At all material times, Newport knew or should have known that the Plan and the Plan Participants were relying on Newport's valuation to be accurate.

847.    Newport's valuations were what formed the basis for the quarterly statements that were mailed (often by Newport) to Plan Participants which showed the Plan Participants what their respective vested balances in the Fund were.

848.    At all material times, Newport knew or should have known that the Department of Retirement Services's auditor was relying on Newport to provide it truthful and accurate information regarding the Plan's valuation and any associated restrictions on the Plan's investments.

849.    Indeed, David Fiszer routinely signed off on reports and letters using his CPA designation. He did this because he wanted the reader to place more credibility on his work.

850.    Newport was required to exercise the reasonable care and competency ordinarily required of accountants in the same or similar circumstances when performing the valuations of the Plan's assets and communicating those valuations to the Plan, Plan Participants, and the Department's auditor.

851.    Newport breached the standard of care to the Plan, Plan Participants, and the Department's auditor by inaccurately performing its valuation of the plan's assets.

852.    The Plan, Plan Participants, and the Department's auditor did rely on Newport's plan valuations, and each had no knowledge or reason to suspect that Newport's valuations were unreasonable and inaccurate.

853.    The reliance of the Plan, the Plan Participants, and the Department's auditor on Newport's plan valuations were each reasonable and justifiable.

854.    At all material times, Rodney Brown had a licensed CPA, Mr. Rodney Brown, assigned to perform audits of the Department of Retirement Services.

855.    The scope of Rodney Brown's work including auditing the revenues, expenses, and assets and liabilities of the Department.

856.    Rodney Brown performed annual audits in all relevant years during Dr. Harris's tenure as the executive director of the Department.

857.    At all material times, Rodney Brown owed the Plan and Plaintiffs duties to exercise reasonable care in performing audits of the Department in order to identify any fraudulent or self-dealing behavior by Dr. Harris or others and to accurately perform the scope of his audit.

858.    At all material times, Rodney Brown knew or should have known that the Plan and the Plan Participants were relying on Rodney Brown's audit to be accurate.

859.    At all material times, Rodney Brown knew that the results of his audit would be subsequently distributed by the Department of Retirement Services to other members of the AME, including Plan Participants, in order to assure them that the Department was operating as a responsible steward of the Plan.

860.    Rodney Brown was required to exercise the reasonable care and competency ordinarily required of accountants in the same or similar circumstances when performing an audit of the Department and communicating the results of that audit.

861.     Rodney Brown breached the standard of care to the Plan and Plan Participants by accepting an auditing engagement from the Department when it lacked the size, experience, resources, and industry qualifications to carry out a thorough audit of an organization with the Department's size and importance.

862.     Rodney Brown breached the standard of care to the Plan and Plan Participants, by including inaccurate information in his audit and not catching self-dealing transactions by Dr. Harris.

863.     Notwithstanding any negligent, reckless, or deliberate misrepresentations by Newport to Rodney Brown, Rodney Brown could have detected and reported the existence of at least some of the self-dealing transactions by Dr. Harris if it had adhered its professional standard of care.

864.     The Plan and Plan Participants did rely on Rodney Brown's audit and each had no knowledge or reason to suspect that Rodney Brown's audits were inaccurate.

865.     The reliance on Rodney Brown's plan valuations by the Plan and Plan Participants were each reasonable and justifiable.

866.     As a direct and proximate result of Newport and Rodney Brown's breaches of their duties and the standard of care, Plaintiffs, the Class, and the Plan have suffered damages in excess of $75,000.

867.     Plaintiffs, as beneficiaries of the Plan, are permitted under Tennessee law to bring this claim on the Plan's behalf.

868.     Dr. Harris, and subsequently Dr. Miller, in their capacities as trustees of the Plan committed wrong against the Plan. Further, the remaining Defendants under this cause of action harmed the Plan and participated in Dr. Harris's and Dr. Miller's breach of fiduciary duty.

869.    Plaintiffs, in their capacity as beneficiaries of the Plan, are also permitted to bring this action on behalf of the Plan, because Dr. Harris and Dr. Miller did not take any actions on behalf of the Plan to recover from the additional Defendants prior to Plaintiffs' filing of this lawsuit. And, to this date, Dr. Miller, as the current trustee of the Plan, has not pursued any claims against the other Defendants, only the Church has filed cross-claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, and derivatively on behalf of the Plan, pray the Court for the following relief:

1.    That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    That the Court name Plaintiffs as Class Representatives and their counsel as Class Counsel;

3.    That the Court enter an order finding in Plaintiffs' favor on Counts I through X;

4.    That the Court award Plaintiffs, the Class, and the Plan the costs incurred in the pursuit of this action;

5.    That the Court award Plaintiffs, the Class, and the Plan attorneys' fees as allowed by law;

6.    That the Court award Plaintiffs, the Class, and the Plan punitive damages;

7.    That the Court enter an order that Defendants operate the Plan in compliance with ERISA, as promised in the Plan document and Doctrine and Discipline, and in accordance with governing state-law fiduciary duties, including by:

    a.    Requiring Defendants to invest the assets of the Plan in a prudent and loyal manner;

    b.    Requiring AMEC to enroll all employees pursuant to Plan terms, as described herein; and

**Page 125 of 128**

c.     Requiring AMEC to make contributions pursuant to Plan terms, as described herein;

8.     That the Court award Plaintiffs, the Class, and the Plan damages and injunctive relief as appropriate, including but not limited to an equitable accounting (at Defendants' expense), punitive damages, and emotional harm damages;

9.     That the Court award Plaintiffs, the Class and the Plan punitive damages in amounts reflecting the intentional, malicious, reckless and grossly negligent behavior of the various Defendants.

10.     That the Court enter an order that Defendants be removed from their roles as fiduciaries for the Plan, and appointing an independent fiduciary to bring the Plan into compliance applicable state law and to manage the Plan and its assets in compliance with applicable law;

11.     That the Court award Plaintiffs, the Class, and the Plan pre-judgment and post-judgment interest;

12.     That the Court award Plaintiffs, the Class, and the Plan reasonable attorneys' fees, costs, and expenses;

13.     That all costs of this action be taxed against Defendants; and

14.     That the Court award such other and further relief as this Court may deem just and proper.

15.     Plaintiffs demand a trial by jury.

16.     Plaintiffs reserve the right to amend the Complaint.

Dated: August 29, 2024.

Respectfully submitted,

| Interim Co-Lead Counsel | |
| --- | --- |
| */s/ Matthew E. Lee*<br>Matthew E. Lee<br>**MILBERG COLEMAN BRYSON**<br>**PHILLIPS GROSSMAN, PLLC**<br>900 W. Morgan Street<br>Raleigh, NC 27603<br>919-600-5000<br>Fax: 919-600-5035<br>mlee@milberg.com | */s/ Gregorio A. Francis*<br>Gregorio A. Francis<br>**OSBORNE & FRANCIS**<br>**LAW FIRM, PLLC**<br>433 Plaza Real, Suite 271<br>Boca Raton, FL 33432<br>(561) 293-2600<br>Fax: (561) 923-8100<br>gfrancis@realtoughlawyers.com |
| Liaison Counsel | |
| J. Gerard Stranch, IV<br>**STRANCH, JENNINGS**<br>**& GARVEY, PLLC**<br>223 Rosa L. Parks Avenue, Suite 200<br>Nashville, Tennessee 37203<br>(615) 254-8801<br>Fax: (615) 255-5419<br>gstranch@stranchlaw.com | |
| Plaintiff's Steering Committee | |
| Susan L. Meter<br>**KANTOR & KANTOR LLP**<br>19839 Nordhoff Street<br>Northridge, CA 91324<br>818-886-2525<br>Fax: 818-350-6274<br>smeter@kantorlaw.net | Kenneth S. Byrd<br>**LIEFF CABRASER**<br>**HEIMANN & BERNSTEIN, LLP**<br>222 2nd Ave S<br>Nashville, TN 37210<br>615-313-9000<br>Fax: 615-313-9965<br>kbyrd@lchb.com |
| | |

Dhamian Blue
**BLUE LLP**
P.O. Box 1730
Raleigh, NC 27602
919-833-1931
Fax: 919-833-8009
dab@bluellp.com

Richard Schulte
**WRIGHT & SCHULTE LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
937-435-9999
Fax: 937-435-7511
rschulte@yourlegalhelp.com

Julie Nepveu
**AARP Foundation**
601 E Street, NW
Washington, DC 20049
(202) 434-6280
Fax: (202) 434-6424
jnepveu@aarp.org